## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JESSE CROWELL, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FCA U.S. LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jesse Crowell on behalf of himself and all others similarly situated, by and through his undersigned counsel, brings this action against Defendant FCA U.S. LLC ("FCA" or "Defendant"). For his Complaint, Plaintiff alleges the following based on personal knowledge as to his own acts and on the investigation conducted by his counsel as to all other allegations:

### INTRODUCTION

1.     This consumer class action arises from a defect found in model year 2021 model year Jeep Wrangler 4xe (the "Class Vehicles"). The Class Vehicles currently have a base MSRP of $54,735[1].

---

[1] https://www.jeep.com/2021/wrangler/wrangler-4xe.html?sid=913821&KWNM=2021+wrangler+rubicon+4xe&KWID=43700064394018456&TR=1&channel=paidsearch&gclid=ba0bc02f68ee10b71fdea2603828ffb6&gclsrc=3p.ds&ds_rl=1273281&ds_rl=1267886&ds_rl=1272981&msclkid=ba0bc02f68ee10b71fdea2603828ffb6 (accessed 1/4/2023)

1

2.      Defendant portrayed the Class Vehicles as plug-in hybrid SUVs capable of running off either gasoline or electricity.

3.      However, Defendant manufactured, marketed, and distributed the Class Vehicles without disclosing a key defect in material, workmanship, and/or design. Specifically, the Class Vehicles automatically, improperly, and frequently manifest the Fuel and Oil Refresh Mode ("FORM") for extended periods of time, which makes electric-only operation impossible (the "Defect"). The Defect is particularly prevalent in cold weather. Once the Defect is triggered, customers report having almost no access to electric-only vehicle operation for months at a time, particularly during the winter.

4.      In addition to concealing the Defect, Defendant actively mispresented the attributes and capabilities of the Class Vehicles by claiming that the vehicles had been thoroughly tested and featured electric-only drive abilities on par with gasoline-powered driving.

5.      The Defect is material because it deprives users of the substantial benefit for which they paid a premium and which informed Plaintiff Crowell and the Class Members' purchasing decisions. The Class Vehicles are represented as capable of operating from two sources of power: gasoline and electric charge. By rendering electric-only operation unavailable, the Defect eliminates the benefits of the Class Vehicles' purported unique plug-in hybrid operations.

6.     Had Plaintiff Crowell and the Class Members known of the Defect, they would not have purchased the "hybrid" Class Vehicles or would have paid considerably less for them.

7.     Despite notice and knowledge of the Defect from customer complaints, information sent from dealers, and its own internal records, including pre-sale durability testing, FCA has not recalled the Class Vehicles, offered its customers suitable repairs or replacements free of charge, or offered to reimburse its customers who have incurred out-of-pocket expenses to repair the Defect.

8.     Plaintiff has suffered harm as a result of Defendant's decision not to disclose the Defect and to misrepresent the Class Vehicles.  Plaintiff purchased a brand new 2021 Jeep Wrangler 4xe which suffers from the Defect.

9.     On behalf of the class and subclass he proposes to represent, Plaintiff seeks an award of damages, including the costs of inspecting and repairing the Class Vehicles, and appropriate equitable relief, including an order requiring FCA to adequately disclose and repair the Defect in its Class Vehicles.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and

costs.  This is a class action in which more than two-thirds of the proposed plaintiff class are citizens of states other than the Defendant.

11.    This Court has personal jurisdiction over Defendant because it is incorporated in this district, conducts substantial business in this judicial district, and intentionally and purposefully placed the Class Vehicles into the stream of commerce within this district and throughout the United States.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant is incorporated in this district, transacts business in this district and is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.

## PARTIES

13.     Plaintiff Jesse Crowell is a resident of Mount Laurel, New Jersey who purchased a Class Vehicle in Jarrettsville, Maryland in May 2021.

14.     Defendant FCA U.S. LLC is a Delaware limited liability company, with its principal place of business located at 1000 Chrysler Dr., Auburn Hills, MI 48326-2766. Defendant distributes the Class Vehicle to consumers through its dealer network throughout the United States.

## FACTUAL ALLEGATIONS

### FCA Electrifies Its Lineup

15.     Emissions regulations by the US and European governments have forced FCA to invest in its electric vehicle (EV) future.  FCA's parent company stated in 2021 that the company would invest over 30 billion euros over the next five years.[2]  FCA has committed that by 2025, it will have a battery electric vehicle in every SUV segment.[3] This would include hybrid, plug-in hybrid, or exclusively electric vehicles.

16.     Christian Meunier, Global President of Jeep Brand – FCA stated: "The electrification of the Jeep lineup will allow commuters to travel solely on

---

[2] https://www.reuters.com/business/autos-transportation/stellantis-says-h1-margin-expected-top-annual-target-55-75-2021-07-08/ (last accessed 1/4/2023)
[3] https://www.motorauthority.com/news/1132869_jeep-to-have-a1n-electric-vehicle-in-every-suv-segment-by-2025 (last accessed 1/4/2023)

electric power, delivering an efficient and fun on-road experience and offering an ability to enjoy even more Jeep capability off-road in nearly complete silence."[4] The company claims to be "designing and developing the most capable and sustainable Jeep SUVs to date, on our path to becoming the leading zero-emission SUV brand in the world."[5]

17.     The Jeep Wrangler 4xe is a plug-in hybrid vehicle that first went on sale in or around April 2021. It comes equipped with a 17-kilowatt hour, 96-cell lithium-ion battery pack that FCA claims "is capable of up to 21 miles of nearly silent, zero-emission, electric-only propulsion."[6]

18.     Defendant represented the Class Vehicles as offering a variety of transportation modes to capitalize on the vehicles' electric propulsion.[7]

---

[4] https://media.stellantisnorthamerica.com/newsrelease.do?id=22673&mid=1368 (last accessed 1/4/2023)
[5] https://www.autoweek.com/news/future-cars/a41109828/2025-jeep-launching-four-evs/ (last accessed 1/4/2023)
[6] https://media.stellantisnorthamerica.com/newsrelease.do?id=22673&mid=1368 (last accessed 1/4/2023)
[7] https://www.jeep.com/wrangler/wrangler-4xe.html?sid=1037056&KWNM=jeep+4xe&KWID=43700057016404309&TR=1&channel=paidsearch&ds_rl=1273287&ds_rl=1267886&ds_rl=1272981&gclid=EAIaIQobChMI18z0_cCe9wIVNhGzAB1ndgOaEAAYASAAEgKpafD_BwE&gclsrc=aw.ds (last accessed 1/4/2023)



19.     FCA prominently displays the Class Vehicles' 21-mile all-electric range throughout its website.[8]



---

[8] https://www.jeep.com/2021/wrangler/wrangler-4xe.html#:~:text=Does%20the%20Jeep%C2%AE%20Wrangler,motor%20and%20a%20gas%20engine. (last accessed 1/4/2023)

20.    As a result of this 21-mile electric driving range, FCA claimed that users would have the opportunity to "get around town solely on electric power."[9]



21.    Below in the website's frequently asked questions section, FCA again promises that customers would have the option to "get around town on all-electric power."[10]



22.    The Vehicle's product page states that its default setting is to run in Hybrid mode, meaning that it consumes electric power first until it runs out of charge, and then uses its gasoline engine.[11] The Vehicle's product page also states

---

[9] *Id.*

[10] *Id.*

[11] https://www.jeep.com/wrangler/wrangler-4xe.html?sid=913821&KWNM=jeep+hybrid&KWID=43700064414371333&TR=1&channel=paidsearch&gclid=0fcc334bb1961dd180fe5108f6b0466d&gclsrc=3p.ds&ds_rl=1273287&ds_rl=1267886&ds_rl=1272981&msclkid=0fcc334bb1961dd180fe5108f6b0466d  (last accessed 1/4/2023)

that the Vehicle can run in Electric Mode "[w]hen the battery has more than a 1% charge," and is capable of running in this mode "for up to 21 miles."[12]



      23.    Like other hybrid and plug-in hybrid offerings, the Vehicle has both a gasoline engine and electric motors to enable gasoline-only, battery-only—or a combination of the two—driving. In its promotional materials, FCA stated it had "logged over 1.4 million miles of real world on-road and off-road validation in all the corners of the world to make sure it's ready. We want to make sure this 'do anything' Wrangler does everything we promised."[13]

---

[12] *Id.*
[13] https://www.youtube.com/watch?v=VAvM3-C3m7s (accessed 1/4/2023)

24.     More specifically, FCA assured customers, via the official Jeep website, to "start charging from home to enjoy the benefits of commutes on pure electric power." " with the Class Vehicles.[14]



25.     Soon after launching, the 2021 Jeep Wrangler 4xe took the top spot in US car sales as the "No. 1 best-selling plug-in hybrid."[15]

---

[14]https://www.jeep.com/wrangler/wrangler-4xe.html?sid=913821&KWNM=2022+wrangler+4xe&KWID=43700067440561671&TR=1&channel=paidsearch&gclid=4948eb3a357e18f8ce608967e757bb7d&gclsrc=3p.ds&ds_rl=1267886&ds_rl=1272981&ds_rl=1273020&msclkid=4948eb3a357e18f8ce608967e757bb7d  (accessed 1/4/2023)

[15] https://insideevs.com/news/517943/us-je11ep-chrysler-sales-2021q2/ (accessed 1/4/2023)

26.     As part of its ad campaign, Defendant put forth advertisements

showcasing the Class Vehicles' ability to function in cold weather.[16]



02 Feb 2021

**Winter driving with the Jeep® 4xe models**



**Winter driving with the Jeep® 4xe models**



12



The Defect

27.     Contrary to FCA's representations that owners can use electric power so long as the battery is more than 1% full, there is an additional necessary condition tied to engine lubrication.

28.     FCA's manual states that the 2021 Class Vehicle will enter FORM to maintain engine lubrication properties "if the system detects a stale fuel or aged oil condition after a long period without combustion engine operation."[17] When this

---

[17] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf, page 25 (accessed 1/4/2023)

13

message appears, owners are unable to drive their vehicles using only electric power.

29.     Unfortunately, the defective nature of the Class Vehicles results in FORM manifesting far more often and longer than reasonable. Indeed, Class Vehicle operators report having little to no access to electric-only operation for months on end. As a result, the Defect frequently deprives the user of access to plug-in powered driving.

30.     FCA's manual further states that the purpose of FORM is "[t]o prevent engine and/or fuel system damage due to stale fuel, as well as maintaining internal engine lubrication,"[18] and acknowledges the necessity of FORM because "it is possible to operate this vehicle for extended periods of time without running the gas engine[.]"[19]

31.     However, other conditions may also trigger FORM. FCA's manual states: "Frequent short trips at low ambient temperature conditions are more likely to trigger the lubrication based mode."[20]

32.     The conditions necessary to get out of FORM are nebulous, inconsistent, and, in some cases, contradictory. The manual simply states: "The

---

[18] *Id.*, at 37
[19] *Id.*
[20] *Id.*

14

vehicle will automatically exit the Fuel and Oil Refresh Mode when conditions have been satisfied,"[21] without specifying what those conditions are.

33.     Owners are given no clear idea of how long they will remain without access to electric-only driving. The 2021 Jeep Wrangler 4xe manual states: "[T]he engine may run for a period of up to 20 minutes when fully warm whenever the vehicle is operational (no electric only operation). If the vehicle is shut down before conditions to exit the refresh mode have been satisfied, the engine may run for additional time on subsequent trips."[22] However, this guidance differs substantially from users' experience. Class Vehicle owners report having almost no access to electric-powered transport for months while FORM predominates.

34.     Unsurprisingly, FCA has subsequently updated its wait time estimate in the 2022 Jeep Wrangler 4xe to account for the role of cold weather in triggering or exacerbating the Defect.[23] Upon information and belief, the 2021 and 2021 Jeep Wrangler 4xe vehicles are mechanically identical.[24]

---

[21] *Id.*
[22] *Id.*
[23] https://www.4xeforums.com/threads/fuel-and-oil-refresh-mode.210/ (last accessed 1/4/2023)
[24] https://www.autoblog.com/2021/10/26/2022-jeep-wrangler-4xe-price-increase/ (last accessed 1/4/2023)



35.     However, the updated 2022 manual presents more questions than answers. It does not provide a temperature threshold whereupon the vehicle becomes "fully warm". As a result, little guidance is provided by the claim that "[i]f the vehicle enters Fuel and Oil Refresh Mode to maintain engine lubrication properties, the engine may run for a period of up to 2.5 hours when fully warm whenever the vehicle is operational (no electric only operation)."[25] To make

---

[25] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2022/Wrangler_4xe/P133041_22_JL_H_SU_EN_USC_DIGITAL.pdf, page 40 (1/4/2023)

matters worse, owners cannot know whether their vehicle entered FORM because of stale fuel, to maintain engine lubrication, or for both reasons.[26]

36.    Similarly, there is no approximation whatsoever as to what FCA means when it adds that "[o]il refresh may take significantly longer in freezing temperatures."[27]

37.    Despite these ambiguities, it is clear that the Defect is particularly problematic during the winter season. FCA further acknowledges the Class Vehicles' seasonal deficiencies in the below post which notes, among other things, that "[s]ome customers have commented about repeated or extended incidents of Fuel Oil Refresh Mode (FORM) during the winter season" and "in this case, FORM will return as long as the weather remains cold. We have high confidence that these frustrations will be resolved when the weather becomes warmer."[28]

---

[26] The manuals of both model years suggest that owners may exit FORM "by adding a minimum of four gallons of new fuel to the vehicle's fuel tank." However, they go on to reveal that "if the vehicle enters Fuel and Oil Refresh Mode to maintain engine lubrication, adding fuel will not exit the mode sooner." *Id*. at 39; https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf, page 37 (accessed 1/4/2023)

[27] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2022/Wrangler_4xe/P133041_22_JL_H_SU_EN_USC_DIGITAL.pdf at 40 (last accessed 1/4/2023)

[28] https://www.4xeforums.com/threads/fuel-and-oil-refresh-mode.210/ (last accessed 1/4/2023)



**#512** · Mar 18, 2022

JeepCares
Registered
Joined Mar 18, 2021
298 Posts

Hello all. We want to reach back out and provide further insight here, as we see that there are still conversations surrounding FORM. Our internal engineers have comprised the following details and we encourage you all to take a look. We have also included the link to the updated Owner's Manual which now reflects the changes to the section marked "Fuel and Oil Refresh Mode".

Thanks, Jeep Cares

**Further information on the operation of Fuel Oil Refresh Mode (FORM) in the Wrangler 4xe**

**What is FORM?**

Some customers have commented about repeated or extended incidents of Fuel Oil Refresh Mode (FORM) during the winter season. If this is the first time you're hearing about FORM, please refer first to the owner's manual information:
https://msmownerassets.z13.web.core...ler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf

The purpose of this message is to better communicate how the oil dilution portion of FORM works, why some people see it frequently but others don't, and how to get Electric drive mode back. We won't discuss the stale fuel or spark maintenance portions of FORM here, because they are more straightforward and not seasonal in nature.



**What is happening in the engine?**

Oil dilution FORM exists to reduce the possibility of engine damage caused by contaminants diluted in the engine oil. The contaminant of primary concern is gasoline, since it's continually injected directly into the combustion chamber while running. Although the 2.0-liter turbo 4-cylinder engine in the Wrangler 4xe is manufactured to precise tolerances, piston-ring-to-cylinder-bore sealing varies with engine operating temperature. Sealing is optimized for normal operating temperature. It's normal for some gasoline to make its way past the piston rings when the engine is cold. When the engine becomes warm, the piston rings expand and seal more tightly. Gasoline evaporates out of the hot engine oil, is routed through the Positive Crankcase Ventilation (PCV) system, and is ultimately used to make power.

**Is the Wrangler 4xe different from other vehicles?**

Oil dilution happens in all internal combustion engines. In conventional vehicles, trips of moderate length are enough to resolve the condition. This is why ICE vehicle owners' manuals recommend frequent oil changes in vehicles used for short trips. In Plug-in Hybrid vehicles, some use cases lead to many cold engine startups but little or no engine operation at normal temperature. One example is a customer who uses their Plug-in Hybrid Electric Vehicle (PHEV) just like a Battery Electric Vehicle (BEV), except for 0 - 15 minutes' duration ICE operation during most drive cycles. This short engine operation might come during remote start to warm the cabin, or a short high-speed portion of an otherwise all-electric commute. With that type of usage, especially while the outdoor temperature is cold, it's possible for 100% of engine runtime to occur with the engine well below normal operating temperature. Gasoline dilutes into the oil whenever the engine runs, but never evaporates out again. Over time, the contamination level grows.

You won't see features like FORM in BEV's or HEV's, because they're not subject to this use case. But in PHEVs from other manufacturers, you'll see warnings like "Low Engine Use Mode," "Maintaining Hybrid mode to protect engine," or "Engine Maintenance Mode," which all do the same thing as FORM.



**How does the vehicle "know" about dilution? What does it do about it?**

It's not practical to directly measure the proportion of gasoline diluted in the oil of a running engine. Before the launch of the Wrangler 4xe, Stellantis engineers built a model which accurately predicts the rate of dilution and evaporation inside the engine. This model runs at all times in the Wrangler's computers, and is based mainly on engine oil temperature, engine load and engine runtime. This is why it's important never to reset your Oil Life Indicator, if you have not changed the oil. To do that would introduce a large error in the modeled vs. actual dilution, and increase the probability of engine damage. Wrangler 4xe owners who encounter dilution FORM have commented that their engine oil smells like gasoline. This indicates that the dilution model is correctly identifying and mitigating a potentially damaging situation.

Dilution FORM in the Wrangler 4xe behaves differently, depending on modeled dilution level.

· Step 0: Normal Operation: Below a bottom threshold, vehicle operation is normal.

· Step 1: Moderate fuel dilution: Between the bottom and middle thresholds, silent start allows electric operation during a drive until the first ICE start. After that, you'll see the FORM message and the ICE will continue running until you shut the car off.

· Step 2: More fuel dilution: Between the middle and top thresholds, EV operation is not allowed. The ICE will start when you power up the vehicle and remain running until you shut down, or the bottom threshold is reached, whichever comes first.

· Step 3: More fuel dilution: Above the top threshold, EV operation is not allowed, and the vehicle will instruct you to perform an oil change.



Search Community

Depending on outside temperature and how the vehicle is being operated, it could climb or descend this ladder. Based on thorough review of feedback from dealership service departments, directly from customers through Jeep Wave, and from social media postings this winter, Jeep believes some Wrangler 4xe customers' engines are rarely warming fully to operating temperature. For this reason, oil dilution is staying between the bottom and middle thresholds ("Step 1") for extended periods of time in some vehicles operating in cold climates. The user's experience is therefore similar to frequently leaving and re-entering dilution FORM. Some customers may also be experiencing extended periods in "Step 2." Jeep Engineering and Jeep Wave are not aware of any cases where FORM is acting differently than designed, or where an unrelated hardware issue is exacerbating FORM duration or frequency.

**How can I get Electric mode back?**

The use case which leads to this level of dilution can vary, but the path to resolution is always the same:

· Start the engine and allow engine oil to reach normal operating temperature. 169°F (76°C) is the minimum, but normal operating temperature is above 194°F (90°C). Elevated speed and load will warm the engine oil most quickly.

· Continue running the engine until FORM is no longer shown in the Message Center of the instrument cluster. Depending on the dilution level, oil temperature and outside temp, this can take from 20 minutes to 2.5 hours.

· In case the above steps are not possible, change the engine oil and reset the oil life indicator.

· Never reset the oil life indicator without changing the engine oil.



38.     Stating that the Defect will fade away and electric-only operation will return once the weather gets warmer constitutes a wholly inadequate and, by definition, short-term solution to a major problem.

39.     Due to the Defect, Defendant's omissions regarding the Defect, and Defendant's misleading representations surrounding the Defect, consumers paid a

substantial premium for plug-in hybrid vehicles that often lack electric-powered driving.

Defendant Misrepresented the Capabilities of the Class Vehicles

40.     Defendant has admitted to the Defect by altering the language of the 2022 Jeep Wrangler 4xe manual, as discussed above, to acknowledge that, once the vehicle enters the FORM cycle, hours of gasoline-only operation is needed before the user could retain access to electric-only operability.[29] This constitutes a significant departure from Defendant's position in the 2021 manual, that electric-only operation could return after only "a period of up to 20 minutes when fully warm whenever the vehicle is operational."[30] The 2022 manual also differs from its predecessor by acknowledging that freezing temperatures result in a "significantly longer" period of gasoline powered operation before electric-only operation becomes available.[31]

---

[29] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf, page 37 (accessed 1/4/2023)

[30] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf, page 37 (accessed 1/4/2023)

[31] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2022/Wrangler_4xe/P133041_22_JL_H_SU_EN_USC_DIGITAL.pdf, page 40 (1/4/2023)

41.     Despite this knowledge, Defendant has failed to act to notify consumers of its omissions, remedy its misrepresentations regarding the Class Vehicles, or implement a recall to remedy or eliminate the Defect.

42.     On December 14, 2022 Plaintiff sent Defendant a notice letter, informing FCA of his intent to bring the below-enumerated claims unless FCA remedied its misconduct. Despite the letter arriving on December 20, 2022, Defendant has provided no response.

**Plaintiff Crowell's Factual Allegations**

43.     Plaintiff Jesse Crowell is a citizen and resident of Mt. Laurel, New Jersey.

44.     On or about May 8, 2021, Plaintiff Crowell purchased a 2021 Jeep Wrangler Unlimited 4xe from Keene Dodge Chrysler Jeep Co., located at 3707 Norrisville Rd., Jarrettsville, MD 21084, for a total price of $78,621.08.

45.     Plaintiff Crowell made the decision to purchase the 2021 Jeep Wrangler 4xe after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Crowell chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles.

46.     Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Crowell of the Defect. Plaintiff Crowell

24

reasonably expected that the Class Vehicle, would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

47.     Plaintiff Crowell purchased the Class Vehicle for personal use. Plaintiff Crowell has always attempted to use the Class Vehicle in the normal and expected manner.

48.     On or about October 2021, when his vehicle had roughly 5,000 miles, Plaintiff Crowell first experienced the Defect and was unable to drive off of electric power alone. While the FORM message occasionally disappeared, Plaintiff Crowell was largely deprived of the Class Vehicle's electric-only operation between October 2021 and February 2022.

49.     Plaintiff Crowell called his local dealership on or around November 2021 to inquire about potentially leaving the car at the dealership while they figured out the problem but was informed there was no loaner car available. He therefore declined to leave the car with the dealership. He was told that he would be contacted if a loaner became available. Plaintiff Crowell was never contacted about a loaner vehicle.

50.     Plaintiff Crowell was aware from Facebook pages discussing the Jeep 4xe that other dealers told customers there was no fix for the Defect and that the Class Vehicles were performing normally. Plaintiff Crowell did not press his

dealer about a loaner vehicle because of the experience others were reporting online, as well as the fact that he needed the car for his 12-hour workdays.

51.     On or about December 4, 2021, Plaintiff Crowell changed the oil himself on his Class Vehicle. The next day, the FORM message again displayed on his dashboard. Plaintiff Crowell ran the Class Vehicle for more than three hours in an attempt to make the FORM message disappear, but the FORM message remained.

52.     Plaintiff Crowell considered purchasing the diesel Wrangler rather than the 4xe. He ultimately decided on the Class Vehicle because his drive to work is eleven miles and he wished to take advantage of the all-electric commute that Defendant's representations led him to believe was possible with the Class Vehicle.

53.     Due to Defendant's concealment, fraud, omissions, and refusal to correct the Defect, Plaintiff Crowell did not receive the benefit of his bargain. Had Plaintiff Crowell known that the vehicle's electric-only range was frequently unavailable on demand, even when the battery was charged, Plaintiff Crowell would not have purchased the Class Vehicle or would have paid less for it.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action under Rule 23 of the

Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the

"Nationwide Class"), defined as:

> Any person in the United States who purchased or leased, other than for
> resale, a Class Vehicle.

55.     In addition, state subclasses are defined as follows:

> **Maryland Subclass:** All persons who bought or leased, other than for
> resale, a Class Vehicle in the state of Maryland.

56.     The Class and these Subclasses satisfy the prerequisites of Federal

Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

57.     **Numerosity and Ascertainability:** Plaintiff does not know the exact

size of the Class or identity of the Class Members, since such information is the

exclusive control of Defendant. Nevertheless, the Class encompasses thousands of

individuals dispersed throughout the United States. The number of Class Members

is so numerous that joinder of all Class Members is impracticable. The names,

address, and phone numbers of Class Members are identifiable through documents

maintained by FCA.

58.     **Commonality and Predominance:** This action involved common

questions of law and fact which predominate over any questions solely affecting

individual Class Members. These common questions include:

27

i.     Whether Defendant engaged in the conduct alleged herein;

ii.    Whether Defendant had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii.   Whether Defendants should have had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iv.    When Defendant became aware of the Defect in the Class Vehicles

v.     Whether Defendant knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

vi.    Whether Defendant knowingly concealed the Defect in the Class Vehicles;

vii.   Whether Defendant's conduct as alleged herein violates consumer protection laws;

viii.  Whether Defendant's conduct as alleged herein violates warranty laws;

ix.    Whether Defendant's conduct as alleged herein violates other laws asserted herein;

x.     Whether Plaintiff and Class Members overpaid for their Class Vehicles as a result of the Defect; and

xi.     Whether Plaintiff and Class Members are entitled to damages and

equitable relief.

59.     **Typicality:** Plaintiff's claims are typical of the other Class Members'

claims because all Class Members were comparably injured through Defendant's

substantially uniform misconduct as described above. The Plaintiff representing

the Class is advancing the same claims and legal theories on behalf of himself and

all other members of the Class that he represents, and there are no defenses that are

unique to Plaintiff. The claims of Plaintiff and Class Members arise from the same

operative facts and are based on the same legal theories.

60.     **Adequacy:** Plaintiff is an adequate Class representative because his

interests do not conflict with the interests of the other members of the Class he

seeks to represent; Plaintiff has retained counsel competent and experienced in

complex class action litigation; and Plaintiff intends to prosecute this action

vigorously. The Class's interests will be fairly and adequately protected by

Plaintiff and his counsel.

61.     **Superiority:** A class action is superior to any other available means

for the fair and efficient adjudication of this controversy, and no unusual

difficulties are likely to be encountered in the management of this class action. The

damages and other detriment suffered by Plaintiff and the other Class Members are

relatively small compared to the burden and expense that would be required to

individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increased the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## CLAIMS FOR RELIEF

### COUNT I
### Common Law Fraud by Omission
### (Brought on Behalf of the Nationwide Class and alternatively on behalf of the Maryland Subclass)

62.     Plaintiff and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

63.     Plaintiff asserts this theory of fraud by omission on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the Maryland Subclass, against Defendant.

64.     Defendant committed fraud by failing to disclose and actively concealing, at the point of sale and otherwise, the Defect.

65.     Defendant was under a duty to Plaintiff and the Class Members to disclose the Defect because:

      a.  Defendant was in a superior position to know about the existence, nature, cause, and results of the Defect;

      b.  Plaintiff and Class Members could not reasonably have been expected to learn or discover the Defect; and

      c.  Defendant knew that Plaintiff and Class Members could not reasonably have been expected to learn about or discover the Defect.

66.     The Defect and the facts concealed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lower price.

67.     Defendant concealed or did not disclose the Defect in order to induce Plaintiff and the Class Members to purchase the Class Vehicles at a substantially higher price than they otherwise would have paid.

68.     Defendant's omissions were accompanied by the above-discussed affirmative representations that the Class Vehicles could be reliably operated using electric power only.

69.     Plaintiff and Class Members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

31

70.     Plaintiff and the Class Members relied on Defendant's failure to disclose the Defect – in purchasing or leasing the Class Vehicles. As a result of their reliance, Plaintiff and the other Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles. Meanwhile, Defendant has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

71.     As a direct and proximate result of Defendant's misrepresentations and omissions, Plaintiffs and all members of the Class have been damaged in an amount to be proven at trial.

72.     Defendant's acts and omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiff and the Class; and to enrich itself. Defendant's misconduct warrants an assessment of punitive damages in an amount sufficient to punish FAC and deter such conduct in the future, which amount shall be determined according to proof at trial.

## COUNT II
### Common Law Fraud – Affirmative Misrepresentation
### (Brought on Behalf of the Nationwide Class and alternatively on behalf of the Maryland Subclass)

73.     Plaintiff and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

74.     Plaintiff asserts this affirmative misrepresentation theory of fraud on behalf of himself and the Nationwide Class or, in the alternative, on behalf of the Maryland Subclass, against Defendant.

75.     Defendant presented the Class Vehicles as plug-in hybrid SUVs capable of running on either gasoline or electricity, depending on the election of the user.

76.     Defendant actively mispresented the attributes and capabilities of the Class Vehicles by claiming that the vehicles had been thoroughly tested and featured electric-only drive abilities on par with gasoline-powered driving.

77.     Indeed, in its advertisements, FCA claimed that the Jeep Wrangler 4xe had an electric range of 21 miles, supporting its claim that it would meet Consumers' need for a Vehicle that provides "nearly silent, zero-emission, electric-only propulsion." FCA communicated through these advertisements that the Class Vehicles were safe, dependable, and would offer the electric range advertised.

78.     FCA further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material

33

provided with each car, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the battery was fully charged.

79.    FCA knew that these representations were false when made.

80.    Defendant also claimed that the Class Vehicles were capable of providing reliable transportation and even promised that they could provide electric powered transportation on a daily basis.[32]

81.    But the Class Vehicles purchased or leased by Plaintiff and Class Members were, in fact, defective and unreliable because the Class Vehicle's batteries are susceptible to frequent and prolonged deactivation when the Class Vehicle detected stale fuel or ran the gas engine to lubricate it.

82.    FCA has known since at least the first model year that its representations regarding the Class Vehicles' range and usability were false. Even now, FCA advertises the Wrangler 4xe to have a driving range of at least 21 miles. FCA broadcasts these advertisements with the intent that members of the general public rely on FCA's representations in making their purchases.

---

[32] 2022 Jeep® Wrangler 4xe - Hybrid Electric 4x4 SUV (accessed 10/18/2022) ("[w]ith the ability to charge at home and work, you can enjoy the benefits of fully electric daily commutes")

83.     A reasonable consumer would have done just that, expecting that they would in fact be able to run the "plug-in hybrid" Class Vehicles on electric power only at will.

84.     Plaintiff and Class Members relied on FCA's affirmative misrepresentations regarding the range and usability of the Class Vehicles when deciding to purchase or lease the Class Vehicles. Had they known the true nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff and Class Members were therefore fraudulently induced to purchase or lease the Class Vehicles with the defects alleged herein, and the resulting harms.

85.     To the extent that FCA's conduct was willful, oppressive, or malicious, Plaintiff and Class Members are entitled to an award of punitive damages.

## COUNT III
### Equitable Injunctive and Declaratory Relief
### (On Behalf of the Maryland Subclass against FCA)

86.     Plaintiff and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

87.     FCA is under a continuing duty to inform its customers of the conditions under which electric-only driving will be unavailable. Despite this, FCA

has failed to inform customers of the key conditions necessary to enable electric-only driving in Class Vehicles currently sold to consumers.

88.     Plaintiff, members of the Maryland Subclass, and the public will suffer irreparable harm if FCA is not ordered to offer rescission to the Maryland Subclass by repurchasing their Class Vehicles for their full cost, and to cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

89.     Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles. Plaintiff and members of the Maryland Subclass sustained injuries, including but not limited to, paying more for Class Vehicles than they otherwise would have, receiving a vehicle worth less than the one they bargained and paid for, paying for diagnoses, repairs, replacements, paying more for fuel than they otherwise would have, and are left with Class Vehicles of diminished value and utility.

**COUNT IV**
**Violation of the Maryland Consumer Protection Act ("MCPA")**
**Md. Code Ann., Commercial Law § 13-101, *et seq.***
**(On Behalf of the Maryland Subclass)**

90.     Plaintiff and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

91.     Plaintiff brings this claim individually and on behalf of the Maryland Subclass.

92.     Plaintiff and Maryland Subclass members who purchased Class Vehicles containing the Defect are "consumers" under MCPA.

93.     The Class Vehicles are consumer goods within the meaning of the MCPA.

94.     The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

95.     Defendant violated the MCPA by, *inter alia*, engaging in the following unfair, deceptive acts or practices:

A. Failing to disclose material facts that deceived and had the tendency to deceive; and

B. Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services.

96.     Defendant violated the MCPA by concealing, suppressing or omitting material facts regarding the Defect and the Class Vehicles, including, but not limited to, the fact that the hybrid system does not perform as advertised, rendering the Class Vehicles unsuitable for electric-only driving. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase or how much to pay for, for the compromised hybrid system and the Class Vehicles.

97.     Therefore, Defendant concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff and the Maryland Subclass would rely on the omissions in the purchase of their Class Vehicles.

98.     To this day, Defendant continues to violate the MCPA by actively concealing the material information about the Class Vehicles and the Defect and by representing to Plaintiff and members of the Maryland Subclass that the Class Vehicles and the compromised hybrid system performs better than it in fact does and is suitable for certain uses for which it is not suited. Upon information and belief, Defendant has utilized the same fraudulent marketing strategy with regard to the 2022 model year.

99.     Defendant intended that Plaintiff and the Maryland Subclass members rely on its concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

100.    Defendant's practices, acts, policies and course of conduct violated MCPA's prohibition on unfair and deceptive conduct in that:

A. At the time of sale, Defendant knowingly and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff and Subclass members material information, namely the Defect and its impact on the performance of the Class Vehicles.

B. Thereafter, Defendant failed to disclose these facts to Plaintiff and the Subclass members, through warnings or other notices, and/or actively concealed the Defect from them, even though Defendant knew of the

38

issue at the time of manufacture because FCA designed and/or programmed the hybrid system to deactivate when FORM activated.

C. Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the Class Vehicles would include the Defect and that the Class Vehicles would perform substantially worse than advertised and be unsuitable for some uses.

D. Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles and compromised hybrid system to the consuming public and to represent that they were in good working order, merchantable, and performed as advertised, despite Defendant's knowledge that they would not perform as intended, represented, and warranted. Specifically, beginning in September 2020, FCA made the above-discussed misleading representations to consumers on press releases regarding the attributes of the hybrid system, while omitting the Defect. In advertising and selling the Class Vehicles, which began in April 2020, FCA failed to disclose the reduced performance of the compromised hybrid system as well as FCA's inclusion of the compromised hybrid system in the Class Vehicles. FCA further exacerbated its misinformation by means of the above-discussed misleading Class Vehicle performance claims on FCA's website.

101.   Defendant's acts and omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers. Defendants have, through knowing, intentional, material omissions, concealed the true inferior nature of the Class Vehicles, and compromised hybrid system.

102.   Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that could not have been reasonably avoided by consumers.

103.   As a direct and proximate result of these unfair acts or practices, Plaintiff and Maryland Subclass members have been damaged because they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would have, received a vehicle worth less than the one they bargained and paid for, paid for diagnoses, repairs, and replacements, paid for fuel they otherwise would not have, and are left with Class Vehicles of diminished value and utility. Meanwhile, FCA has sold more Class Vehicles than it otherwise could have, and FCA has charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

104.   Plaintiff and members of the Maryland Subclass also seek appropriate equitable relief, including an order requiring Defendant to adequately disclose and remediate the issue by offering purchasers of the Class Vehicles rescission and a full refund, and an order enjoining Defendant from engaging in misleading marketing with respect to the Defect in the future.

### COUNT V
### Common Law Breach of Implied Warranty
### (On Behalf of the Nationwide Class)

105.   Plaintiff hereby adopts and incorporates by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

106.   Defendant is a merchant and was at all relevant times involved in the manufacturing, warranting, and distributing for resale to consumers. Defendant

knew or had reason to know of the specific use for which the Class Vehicles, as goods, are purchased.

107.   Defendant entered into agreements with retailers and suppliers to sell its Class Vehicles to Class Members.

108.   Defendant provided Plaintiff and Class Members with implied warranties that the Class Vehicles, as hybrid SUVs, are merchantable and fit for the particular purposes for which they are used and sold.

109.   However, the Class Vehicles are not fit for their particular purpose of providing reasonably reliable transportation by the user's choice of electric-powered or gasoline powered movement. In fact, the electric-only driving capacity is frequently unavailable. Therefore, the Class Vehicles are not fit for their particular purpose as a hybrid SUV.

110.   Similarly, a hybrid vehicle that does not grant the driver access to both power sources is not merchantable.

111.   Privity is not required because Plaintiff and Class Members are the intended beneficiaries of Defendant's warranties and its sale through authorizes retailers. Defendant's retailers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiff and Class Members were their intended beneficiaries.

112.    More specifically, Defendant's intention that its warranties apply to Plaintiff and Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiff and consumer Class Members would be the intended beneficiaries of the Class Vehicles and warranties.

113.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, and distributed for sale by Defendant was reliable for electric-only operation as plugin hybrid SUVs; and (ii) a warranty that the Class Vehicles would be fit for its intended use while it was being operated.

114.    Contrary to the applicable implied warranties, the Class Vehicles, at the time of sale and thereafter, were not fit for the ordinary and intended purpose of providing Plaintiff and Class Members with providing reliable electric powered transportation on a daily basis.  Instead, the Class Vehicles suffers from a defective design and/or manufacture, as alleged herein.

115.    Defendant's sale of defective vehicles and failure to provide a refund caused the implied warranty to fail in its essential purpose.

116.   Defendant breached the implied warranties because the Class Vehicles were sold with the Defect, which substantially reduced and/or prevented them from being used as hybrid vehicles.

117.   Defendant was put on constructive notice about its breach through its review of consumer complaints and upon information and belief, through product testing and communications from dealerships. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

118.   As a direct and proximate result of the foregoing, Plaintiff and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

### COUNT VI
### Magnuson-Moss Warranty Act
### (On Behalf of the Nationwide Class)

119.   Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

120.   Plaintiff and Nationwide Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

121.   Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

122.   The Class Vehicle is a "consumer product[]" as defined in 15 U.S.C. § 2301(1).

123.   Defendant extended an implied warranty to Plaintiff and Nationwide Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers the Defect in its Class Vehicles.

124.   Defendant breached this implied warranty by selling a defective product that was neither merchantable nor fit for its intended purpose.

125.   Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

126.   Defendant breached its express warranties by offering for sale and selling vehicles that were by design and construction defective, thereby subjecting the purchasers or lessors of the Class Vehicles to damages.

127.   Defendant also breached its express warranties by failing to provide an adequate and lasting remedy to cure the Defect within a reasonable time, thereby subjecting the purchasers or lessors of the Class Vehicles to damages. Indeed, while Defendant has suggested that the Defect can be mitigated through the purchase of additional parts, it is only offering to sell said parts to consumers— rather than provide the parts for free as would be appropriate.

128.   As a direct and proximate result of Defendant's breach of the express and implied warranties under the Magnuson-Moss Act, Plaintiff, and the Nationwide Class, have been damaged in an amount to be proven at trial.

**COUNT VII**
**Breach of Express Warranty**
**(Asserted on behalf of the Nationwide Class and alternatively on behalf of the Maryland Subclass)**

129.   Plaintiff and the Nationwide Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

130.   Defendant's Owner Manual was provided with every Class Vehicle and contained affirmations of fact or promise made by the Defendant to Class Members relating to performance of the Class Vehicles which became part of the basis of the bargain and thus an express warranty that the Class Vehicles shall conform to the affirmation. Moreover, the description of the Class Vehicles in the Owner Manual was made part of the basis of the bargain and created an express warranty that the Class Vehicles shall conform to the description.

131.   Specifically, the Owner Manual provides that: "[T]he engine may run for a period of up to 20 minutes when fully warm whenever the vehicle is operational (no electric only operation). If the vehicle is shut down before

conditions to exit the refresh mode have been satisfied, the engine may run for additional time on subsequent trips."[33]

132.   The Class Vehicles do not perform in manner as admitted to by Defendant in the Owner Manual for the 2022 MY.

133.   Further, in its advertisements, FCA claimed that the Class Vehicles had an electric range of 21 miles, supporting its claim that it would meet consumers' need for a vehicle that provides "nearly silent, zero-emission, electric-only propulsion." FCA communicated through these advertisements that the Class Vehicles were safe, dependable, and would offer the electric range advertised, including specifically in cold snowy weather.

134.   FCA further affirmatively misrepresented to Plaintiff in advertising and other forms of communication that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the battery was fully charged. FCA knew that these representations were false when made.

---

[33] *Id.*

135.   Defendant also expressly warranted that the Class Vehicles were capable of providing reliable transportation and even promised that they could provide electric powered transportation on a daily basis.[34]

136.   Defendant also expressly warranted that it would repair and/or replace defects in material and/or workmanship free of charge that occurred during the Limited Warranty.

137.   Defendant breached these warranties by selling to Plaintiff and Class Members Class Vehicles with known problems, which lack the ability to provide electric-powered transportation on a regular basis.

138.   As a result of the Defendant's actions, Plaintiffs and Class Members have suffered economic damages including but not limited to costly repairs, loss of vehicle use, substantial loss in value and resale value of the Class Vehicles, and other related damage.

139.   Defendant's attempt to disclaim or limit its express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitations are unenforceable because FCA knowingly sold a defective product without informing consumers about the manufacturing and/or material defect.

---

[34] 2022 Jeep® Wrangler 4xe - Hybrid Electric 4x4 SUV (accessed 10/18/2022) ("[w]ith the ability to charge at home and work, you can enjoy the benefits of fully electric daily commutes")

140.   Furthermore, Defendant continues to charge Class Members for parts used to mitigate the Defect and has failed to repair the defective vehicles.

141.   The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiff and members of the Class. Among other things, Plaintiff and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between FCA and Class Members, and FCA knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

142.   In addition, FCA's warranty fails of its essential purpose because FCA has been and is unable to effectively repair the Defect. As discussed above, Defendant's response of telling drivers to simply wait until the weather warms is wholly inadequate.

143.   Plaintiff and Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

## COUNT VIII
### Unjust Enrichment/Restitution
### (Asserted on behalf of the Nationwide Class / Asserted in the Alternative on behalf of the Maryland Subclass)

144.   Plaintiff alleges and incorporates by reference the allegations in the preceding paragraphs.

145.   Defendant has been unjustly enriched as a result of the conduct described in this Complaint.

146.   Defendant received a benefit from Plaintiff and the members of the Nationwide Class and Maryland Subclass in the form of payment for the Class Vehicles.

147.   Retention of these benefits by Defendant would be unjust and inequitable because Defendant received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

148.   The benefits (or at least some portion the benefits) that Defendant received were not legitimately earned and came at the expense of Plaintiff and the other members of the Nationwide Class and Maryland Subclass.

149.   Defendant knows that the Class Vehicles do not operate as promised or as a reasonable consumer would expect of a hybrid vehicle, but nonetheless continues to sell them without warning. To make matters worse, Defendant actively lauded and emphasized the performance of the Class Vehicles' electric-

only operation despite knowing that the Defect would render such operation frequently inaccessible for extended periods of time.

150.   Defendant's conduct is unjust, inequitable, and wrongful, but systematically engages in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits, including the substantial premium that consumers pay for vehicles with electric-only driving capabilities.

151.   There is no justification for Defendant's continued silence, and affirmative misrepresentations, as customers purchased the defective Class Vehicles.

152.   It is therefore against equity and good conscience to permit Defendant to retain the proceeds from their sales of the defective Class Vehicles.

153.   Plaintiff and the Nationwide Class are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays that his Court:

A.      Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

B.      Appoint Plaintiff as representative of the Nationwide Class and the Maryland State subclass and his counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiff and Class Members are entitled;

D.      Award pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief against Defendant, including an order requiring FCA to buy back or permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.      Determine that Defendant is financially responsible for all Class notice and administration of Class Relief;

G.      Award reasonable attorney fees and costs; and

H.      Grant such further relief that this Court deems appropriate.

Dated: January 5, 2022                          */s/ P. Bradford deLeeuw*

                                                P. Bradford deLeeuw (DE Bar # 3569)
                                                DELEEUW LAW LLC
                                                1301 Walnut Green Road
                                                Wilmington DE 19807
                                                (302) 274-2180
                                                brad@deleeuwlaw.com

OF COUNSEL:

Nicholas A. Migliaccio (P29077)
Jason S. Rathod (P18424)
MIGLIACCIO & RATHOD LLP
412 H St. NE, Suite 302
Washington D.C. 20002
(202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Daniel E. Gustafson (MN #202241)
David A. Goodwin (MN # 0386715)
Noah L. Cozad (MN#0402643)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
*dgustafson@gustafsongluek.com*
*dgoodwin@gustafsongluek.com*
*ncozad@gustafsongluek.com*

Scott D. Hirsch (FL Bar No. 50833)
SCOTT HIRSCH LAW GROUP, PLLC
6810 N. St. Road 7
Coconut Creek, FL 33073
Telephone: (561) 569-7062
scott@scotthirschlawgroup.com