## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JESSE CROWELL, STEPHANIE GELBER, BENER SAKA, PETER NAU, LONNIE HEETER, ROBERT THOMPSON, KENNETH FORST, JASON FIGLEY, MIKE KWIATKOWSKI, CHRISTOPHER GITTINGS, and LONNIE HEETER, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>  v.<br><br>FCA U.S. LLC and STELLANTIS, N.V.,<br><br>       Defendants. | Case No. 1:23-cv-00013-MN<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Jesse Crowell, Stephanie Gelber, Bener Saka, Peter Nau, Robert Thompson, Jason Figley, Mike Kwiatkowski, Kenneth Forst, Christopher Gittings, and Lonnie Heeter (the "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their undersigned counsel, bring this action against Defendant FCA U.S. LLC and Stellantis, N.V. (collectively "FCA" or "Defendant"). For their Complaint, Plaintiffs allege the following based on personal knowledge as to their own acts and on the investigation conducted by their counsel as to all other allegations:

1

**INTRODUCTION**

1.      This consumer class action arises from a defect found in the 2021-2023 model year Jeep Wrangler 4xe and the 2022-2023 Jeep Grand Cherokee 4xe (the "Class Vehicles"). The Class Vehicles currently have a base MSRP $54,735[1] for Jeep Wrangler 4xe vehicles, a base MSRP of $60,360 for the 2023 Jeep Grand Cherokee 4xe,[2] and a base MSRP of $62,095 for the 2022 Jeep Grand Cherokee 4xe.[3]

2.      Defendant portrayed the Class Vehicles as plug-in hybrid SUVs capable of running off either gasoline or electricity.

3.      However, Defendant manufactured, marketed, and distributed the Class Vehicles without disclosing a key defect in material, workmanship, and/or design. Specifically, the Class Vehicles automatically, improperly, and frequently manifest, and are often locked in, the Fuel and Oil Refresh Mode ("FORM") for extended periods of time, which makes electric-only or electric assisted driving impossible (the "Defect"). The Defect is particularly prevalent in cold weather.

---

[1] https://www.jeep.com/2021/wrangler/wrangler-4xe.html?sid=913821&KWNM=2021+wrangler+rubicon+4xe&KWID=43700064394018456&TR=1&channel=paidsearch&gclid=ba0bc02f68ee10b71fdea2603828ffb6&gclsrc=3p.ds&ds_rl=1273281&ds_rl=1267886&ds_rl=1272981&msclkid=ba0bc02f68ee10b71fdea2603828ffb6 (accessed 1/4/2023)

[2] https://www.jeep.com/select-grand-cherokee.model-compare.html?app=compare&brand=jeep&pageType=vehiclepage&vehicle=grand_cherokee_wl_4xe&year=2023 (accessed 3/29/2023)

[3] *Id.*

Once the Defect triggers, customers report having almost no access to electric-only or electric assisted vehicle operation for days, weeks, or months at a time, particularly, but not exclusively, during colder temperatures.

4.     In addition to concealing the Defect, Defendant actively mispresented the attributes and capabilities of the Class Vehicles by claiming that the vehicles had been thoroughly tested and featured electric-only drive abilities on par with gasoline-powered driving.

5.     The Defect is material because it deprives users of the substantial benefit for which they paid a premium and which informed Plaintiffs' and the Class Members' purchasing decisions. The Class Vehicles are represented as capable of operating from two sources of power: gasoline and electric charge. By rendering electric-only or electric assisted propulsion unavailable, the Defect eliminates the benefits of the Class Vehicles' purported unique plug-in hybrid operations.

6.     Had Plaintiffs and the Class Members known of the Defect, they would not have purchased the "hybrid" Class Vehicles or would have paid considerably less for them.

7.     Despite notice and knowledge of the Defect from customer complaints, information sent from dealers, and its own internal records, including pre-sale durability testing, FCA has not recalled the Class Vehicles, offered its

customers suitable repairs or replacements free of charge, or offered to reimburse its customers, other than select 2023 Jeep Wrangler 4xe owners, who have incurred out-of-pocket expenses to repair the Defect.

8.     Plaintiffs have suffered harm as a result of Defendant's decision not to disclose the Defect and to misrepresent the Class Vehicles.  Plaintiffs purchased Class Vehicles which suffer from the Defect.

9.     On behalf of the class and subclasses they propose to represent, Plaintiffs seek an award of damages, including the costs of inspecting and repairing the Class Vehicles, and appropriate equitable relief, including an order requiring FCA to adequately disclose and repair the Defect in its Class Vehicles.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs.  This is a class action in which more than two-thirds of the proposed plaintiff class are citizens of states other than the Defendant.

11.     This Court has personal jurisdiction over Defendant FCA U.S. LLC because it is incorporated in this district, conducts substantial business in this judicial district, and intentionally and purposefully placed the Class Vehicles into the stream of commerce within this district and throughout the United States.

4

12.     This Court has personal jurisdiction over Defendant Stellantis, N.V. because it conducts substantial business in this judicial district, and intentionally and purposefully placed the Class Vehicles into the stream of commerce within this district and throughout the United States.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendant FCA U.S. LLC is incorporated in this district, transacts business in this district and is subject to personal jurisdiction in this district, and therefore is deemed to be a citizen of this district.

14.     Moreover, Defendant Stellantis, N.V. marketed, advertised, and sold the affected vehicles in this District, through its subsidiary FCA U.S. LLC and otherwise conducted extensive business in this District.

## PARTIES

15.     Plaintiff Jesse Crowell is a resident of Mount Laurel, New Jersey who purchased a Class Vehicle in Jarrettsville, Maryland in May 2021.

16.     Jason Figley is a resident of Coraopolis, Pennsylvania who purchased a Class Vehicle in Natrona Heights, Pennsylvania in December 2022.

17.     Kenneth Forst is a citizen and resident of Grand Rapids, Minnesota who purchased a Class Vehicle in Grand Rapids, Minnesota in March 2022.

18.     Stephanie Gelber is a resident of Getzville, New York who leased a Class Vehicle in Lockport, New York in September 2021.

19.     Christopher Gittings is a resident of Helena, Montana who purchased Class Vehicles in Great Falls, Montana in September and October 2022.

20.     Lonnie Heeter is a resident of Granger, IN who leased a Class Vehicle in Niles, Michigan in December 2021.

21.     Mike Kwiatkowski is a resident of Toledo, Ohio who purchased a Class Vehicle in Toledo, Ohio around August 2021.

22.     Peter Nau is a resident of North Liberty, Iowa who purchased a Class Vehicle in Washington, Iowa in April 2021.

23.     Bener Saka is a resident of Wantagh, New York who leased a Class Vehicle in Amityville, New York in May 2021.

6

24.     Robert Thompson is a citizen and resident of Tucker, Georgia who purchased a Class Vehicle in Cumming, Georgia in July 2021.

25.     Defendant FCA U.S. LLC is a Delaware limited liability company, with its principal place of business located at 1000 Chrysler Dr., Auburn Hills, MI 48326-2766. FCA U.S. LLC distributes the Class Vehicle to consumers through its dealer network throughout the United States.

26.     Defendant Stellantis, N.V. is a multinational corporation with its principal place of business located at Taurusavenue 1 Hoofddorp, NH 2132 LS, Netherlands. Defendant Stellantis, N.V. distributes the Class Vehicle to consumers through its dealer network throughout the United States.

## ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

27.     FCA has possessed exclusive knowledge about the Defect, including from its customer complaints and warranty records, internal emails, reports, analyses, and assessment of engineers, that is unavailable to Plaintiffs and the proposed Class Members.

28.     FCA is estopped from relying on any statutes of limitation or repose due to its acts of concealment. Defendant knew about the Defect in the Class Vehicles but concealed it and/or failed to alert purchasers or potential purchasers. Defendant maintained exclusive control over information concerning the known,

but non-public, Defect and the number of Class Vehicles at issue; Plaintiffs and

Class Members, therefore, could not reasonably have known about the Defect or

the number of Class Vehicles affected.  Defendant is estopped from relying on any

statutes of limitations or repose that might otherwise apply to the claims asserted

herein.

## FACTUAL ALLEGATIONS

<u>FCA Electrifies Its Lineup</u>

29.     Emissions regulations by the US and European governments have

forced FCA to invest in its electric vehicle (EV) future.  FCA's parent company,

Stellantis N.V., stated in 2021 that the company would invest over 30 billion euros

over the next five years.[4]  FCA has committed that by 2025, it will have a battery

electric vehicle in every SUV segment.[5] This would include hybrid, plug-in hybrid,

and/or exclusively electric vehicles.

30.     Christian Meunier, Global President of Jeep Brand – FCA stated:

"The electrification of the Jeep lineup will allow commuters to travel solely on

electric power, delivering an efficient and fun on-road experience and offering an

---

[4] https://www.reuters.com/business/autos-transportation/stellantis-says-h1-margin-expected-top-annual-target-55-75-2021-07-08/ (last accessed 1/4/2023)
[5] https://www.motorauthority.com/news/1132869_jeep-to-have-a1n-electric-vehicle-in-every-suv-segment-by-2025 (last accessed 1/4/2023)

ability to enjoy even more Jeep capability off-road in nearly complete silence."[6]

The company claims to be "designing and developing the most capable and

sustainable Jeep SUVs to date, on our path to becoming the leading zero-emission

SUV brand in the world."[7]

31.     FCA held out the resulting Class Vehicles as "pair[ing] a traditional

gas engine with …incredible electric motor performance."[8]

32.     The Class Vehicles' electric propulsion system come with a

substantial price premium: the Wrangler 4xe costs almost $24,000 more than the

base gas Wrangler,[9] and the Grand Cherokee 4xe commands a more than $20,000

price hike over its gasoline-only variant.[10]

Jeep Wrangler 4xe

33.     The Jeep Wrangler 4xe is a plug-in hybrid vehicle that first went on

sale in or around April 2021. It comes equipped with a 17-kilowatt hour, 96-cell

---

[6] https://media.stellantisnorthamerica.com/newsrelease.do?id=22673&mid=1368
(last accessed 1/4/2023)
[7] https://www.autoweek.com/news/future-cars/a41109828/2025-jeep-launching-four-evs/ (last accessed 1/4/2023)
[8] https://www.jeep.com/ev/4xe-hybrid-suvs.html (last accessed 3/28/2023)
[9] Paulo Acoba, Why doesn't EV mode work in the Jeep Wrangler 4xe when it gets cold outside?, Alt Car News (Feb. 6, 2022),
https://tiremeetsroad.com/2022/02/06/why-doesnt-ev-mode-work-in-thejeep-wrangler-4xe-when-it-gets-cold-outside/ (last visited 3/28/23).
[10] *See* supra note 2.

lithium-ion battery pack that FCA claims "is capable of up to 21 miles of nearly silent, zero-emission, electric-only propulsion"[11] for the 2021-2023 model years.

34.    Defendant represented the Class Vehicles as offering a variety of transportation modes to capitalize on the vehicles' electric propulsion.[12]



---

[11] https://media.stellantisnorthamerica.com/newsrelease.do?id=22673&mid=1368 (last accessed 1/4/2023)

[12] https://www.jeep.com/wrangler/wrangler-4xe.html?sid=1037056&KWNM=jeep+4xe&KWID=43700057016404309&TR=1&channel=paidsearch&ds_rl=1273287&ds_rl=1267886&ds_rl=1272981&gclid=EAIaIQobChMI18z0_cCe9wIVNhGzAB1ndgOaEAAYASAAEgKpafD_BwE&gclsrc=aw.ds (last accessed 1/4/2023)

35.   FCA prominently displays the Jeep Wrangler 4xe's 21-mile all-electric range throughout its website.[13]



36.   As a result of this 21-mile electric driving range, FCA claimed that users would have the opportunity to "get around town solely on electric power."[14]

> **Does the Jeep₀ Wrangler 4xe come in a hybrid?**                              ^
>
> Yes. The Wrangler 4xe is the Most Eco-Friendly Wrangler ever₀. It's a PHEV, which is a Plug-in Hybrid Electric Vehicle with a powerful electric motor and a gas engine. Wrangler 4xe plug-in hybrid technology gives you the confidence and freedom to take every adventure to new places. An EPA estimated all-electric driving range of 21 miles₀ means you can charge up overnight or at public charging stations and get around town solely on electric power, while a combined electric and gas EPA estimated total driving range of 370 miles₀ opens up whole new possibilities for exploring off-road.

37.   In the Jeep website's frequently asked questions section, FCA again promises that customers would have the option to "get around town on all-electric power."[15]

---

[13] https://www.jeep.com/2021/wrangler/wrangler-4xe.html#:~:text=Does%20the%20Jeep%C2%AE%20Wrangler,motor%20and%20a%20gas%20engine. (last accessed 1/4/2023)
[14] *Id.*
[15] *Id.*

11

> **Is the Jeep₀ Wrangler 4xe hybrid worth it?**                                    ^
>
> With the combination of an all-electric and gas driving range, the Wrangler 4xe is a plug-in hybrid electric SUV that powers plenty of adventure. Take off-road exploration to new places or get around town on all-electric power. The Wrangler 4xe makes it possible.

38.     The Jeep Wrangler 4xe's product page states that its default setting is to run in Hybrid mode, meaning that it consumes electric power first until it runs out of charge, and then uses its gasoline engine.[16] The Jeep Wrangler 4xe's product page also states that the Vehicle can run in Electric Mode, off of battery power alone, "[w]hen the battery has more than a 1% charge," and is capable of running in this mode "for up to 21 miles."[17]



---

[16] https://www.jeep.com/wrangler/wrangler-4xe.html?sid=913821&KWNM=jeep+hybrid&KWID=43700064414371333&TR=1&channel=paidsearch&gclid=0fcc334bb1961dd180fe5108f6b0466d&gclsrc=3p.ds&ds_rl=1273287&ds_rl=1267886&ds_rl=1272981&msclkid=0fcc334bb1961dd180fe5108f6b0466d  (last accessed 1/4/2023)
[17] *Id.*

39.    Like other hybrid and plug-in hybrid offerings, the Jeep Wrangler 4xe has both a gasoline engine and electric motors to enable gasoline-only, battery-only—or a combination of the two—driving. In its promotional materials, FCA stated it had "logged over 1.4 million miles of real world on-road and off-road validation in all the corners of the world to make sure it's ready. We want to make sure this 'do anything' Wrangler does everything we promised."[18]

40.    More specifically, FCA reinforced its representations concerning an all-electric commute by telling customers, via the official Jeep website, to "charge at home and work" so as to "enjoy the benefits of fully electric daily commutes" with the Jeep Wrangler 4xe.[19]

41.    The 2022 and 2023 model years of the Jeep Wrangler 4xe carry over the same representation as those noted above.

---

[18] https://www.youtube.com/watch?v=VAvM3-C3m7s (accessed 1/4/2023)
[19] https://www.jeep.com/wrangler/wrangler-4xe.html?sid=913821&KWNM=2022+wrangler+4xe&KWID=43700067440561671&TR=1&channel=paidsearch&gclid=4948eb3a357e18f8ce608967e757bb7d&gclsrc=3p.ds&ds_rl=1267886&ds_rl=1272981&ds_rl=1273020&msclkid=4948eb3a357e18f8ce608967e757bb7d  (accessed 1/4/2023)



RECHARGE

The battery can be fully recharged in approximately 2 hours using an available Level II charger (240V), or 12 hours using the included Level I charger (120V). With the ability to charge at home and work, you can enjoy the benefits of fully electric daily commutes.

42.     Soon after launching, the 2021 Jeep Wrangler 4xe took the top spot in US car sales as the "No. 1 best-selling plug-in hybrid."[20]

Grand Cherokee 4xe

43.     After the success of the Jeep Wrangler 4xe, Defendant introduced the Jeep Grand Cherokee 4xe for the 2022 model year.[21] Defendant describes the Grand Cherokee 4xe as "[u]ncompromising, sophisticated and remarkably capable[.]"[22]

---

[20] https://insideevs.com/news/517943/us-je11ep-chrysler-sales-2021q2/ (accessed 1/4/2023)

[21] Introducing the First-Ever Jeep Grand Cherokee 4xe, Cunningham Chrysler Dodge Jeep Ram, https://www.cunninghamchryslerofedinboro.com/introducing-the-first-ever-jeep-grand-cherokee-4xe (last visited 3/28/2023).

[22] https://www.jeep.com/new-grand-cherokee/grand-cherokee-4xe.html (last visited 3/29/2023)

44.    The 2022 and 2023 Jeep Grand Cherokee 4xe "uses the same plug-in-hybrid powertrain as the Wrangler [4xe],"[23] including the same 400-volt, 17-kWh EV battery.[24] In addition, as with the Wrangler 4xe, "[t]he battery pack system includes a dedicated heating and cooling circuit to keep the battery at its optimum temperature for best performance."[25]

45.    The Grand Cherokee 4xe also features the same three driving modes as the Wrangler 4xe—Hybrid, Electric, and Esave—which provide the same functionality as its Wrangler 4xe counterpart.



---

[23] https://www.caranddriver.com/reviews/a39752223/2022-jeep-grand-cherokee-4xe-drive/ (last visited 3/29/2023)
[24] https://www.media.stellantis.com/em-en/jeep/press/orders-are-now-underway-for-the-entire-range-of-the-all-new-jeep-grand-cherokee-4xe-plug-in-hybrid (last visited 3/29/2023)
[25] *Id.*

46.     FCA's website emphasizes that the Grand Cherokee 4xe can achieve up to 25 miles of "pure EV driving"[26] that helps Grand Cherokee 4xe owners "handle daily commutes."[27]



47.     Defendant's disclaimer about the estimated range makes no mention of potential impacts that cold weather may have on the *availability* of electric propulsion.

6.     Based on manufacturer's estimates with a fully charged battery. Actual mileage may vary.

<u>Class Vehicles Presented as Able to Operate in Cold Weather</u>

48.     As part of its ad campaigns, Defendant put forth, and continues to put forth, advertisements showcasing the Class Vehicles' ability to function in cold

---

[26] Jeep 4xe, Jeep, https://www.jeep.com/ev/4xe-hybrid-suvs.html (last visited 3/28/23).

[27] https://www.jeep.com/new-grand-cherokee/grand-cherokee-4xe.html (last visited 3/29/2023)

weather.[28]



---

[28] https://www.media.stellantis.com/me-en/jeep/video/winter-driving-with-the-jeep-4xe-models-videoclip (last accessed 1/4/2023)

02 Feb 2021

**Winter driving with the Jeep® 4xe models**



Winter driving with the Jeep® 4xe models





49.     As recently as February 7, 2023, Defendant continued to present the

Class Vehicles as capable cold weather SUVs.



50.    The Jeep Grand Cherokee 4xe also features alongside the Jeep

Wrangler 4xe, traversing the same cold-weather climate seemingly without issue.





<u>The Defect</u>

51.    Contrary to FCA's representations that owners can use electric power

so long as the battery is more than 1% full, there is an additional necessary

condition tied to engine lubrication.

52.    FCA's manual states that the 2021 Class Vehicle will enter FORM to

maintain engine lubrication properties "if the system detects a stale fuel or aged oil

condition after a long period without combustion engine operation."[29] When this

message appears, owners are unable to access electric-only or electric-assisted

propulsion to drive their vehicles.

53.    Unfortunately, the defective nature of the Class Vehicles results in

FORM manifesting far more often and for longer than is reasonable. Indeed, Class

Vehicles owners report having little to no access to electric-only or electric-

assisted operation for months on end. As a result, the Defect frequently deprives

the user of access to  electric-only or electric-assisted driving.

54.    FCA's manual states that the purpose of FORM is "[t]o prevent

engine and/or fuel system damage due to stale fuel, as well as maintaining internal

engine lubrication,"[30] and acknowledges the necessity of FORM because "it is

---

[29] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf,
page 25 (accessed 1/4/2023)
[30] *Id.*, at 37

possible to operate this vehicle for extended periods of time without running the gas engine[.]"[31]

55.     However, other conditions may also trigger FORM. FCA's manual states: "Frequent short trips at low ambient temperature conditions are more likely to trigger the lubrication based mode."[32]

56.     The conditions necessary to get out of FORM are nebulous, inconsistent, and, in some cases, contradictory. The manual simply states: "The vehicle will automatically exit the Fuel and Oil Refresh Mode when conditions have been satisfied,"[33] without specifying what those conditions are.

57.     Owners are given no clear idea of how long they will remain without access to electric-only or electric-assisted driving. The 2021 Jeep Wrangler 4xe manual stated, prior to its revision *after* the 2021 Jeep Wrangler 4xe went on sale: "[T]he engine may run for a period of up to 20 minutes when fully warm whenever the vehicle is operational (no electric only operation). If the vehicle is shut down before conditions to exit the refresh mode have been satisfied, the engine may run for additional time on subsequent trips."[34]

---

[31] *Id.*
[32] *Id.*
[33] *Id.*
[34] *Id.*

58.     This guidance differs substantially from users' experiences.[35] Class Vehicles owners report having almost no access to electric-powered transport for months while FORM predominates.

59.     Unsurprisingly, FCA has subsequently updated its wait time estimate in forum posts that it is active in, as well as in the owner's manual of all Class Vehicles to account for the role of cold weather in triggering or exacerbating the Defect.[36] Upon information and belief, the plug-in hybrid powertrains of all Class Vehicles are mechanically identical.[37]

---

[35] See, e.g., Paulo Acoba, Why doesn't EV mode work in the Jeep Wrangler 4xe when it gets cold outside?, Alt Car News (Feb. 6, 2022), https://tiremeetsroad.com/2022/02/06/why-doesnt-ev-mode work-in-the-jeep-wrangler-4xe-when-it-gets-cold-outside/ (last visited 3/28/23); Fuel and Oil Refresh Mode, 4xe Forums, https://www.4xeforums.com/threads/fuel-and-oil-refresh unavailable.1494/page-14 (last visited 3/28/23).
[36] https://www.4xeforums.com/threads/fuel-and-oil-refresh-mode.210/ (last accessed 1/4/2023)
[37] https://www.autoblog.com/2021/10/26/2022-jeep-wrangler-4xe-price-increase/ (last accessed 1/4/2023)



60.     However, the updated owner's manuals present more questions than answers. They do not provide a temperature threshold whereupon the vehicle becomes "fully warm". As a result, little guidance is provided by the claim that "[i]f the vehicle enters Fuel and Oil Refresh Mode to maintain engine lubrication properties, the engine may run for a period of up to 2.5 hours when fully warm whenever the vehicle is operational (no electric only operation)."[38] To make

---

[38] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2022/Wrangler_4xe/P133041_22_JL_H_SU_EN_USC_DIGITAL.pdf, page 40 (1/4/2023)

matters worse, owners cannot know whether their vehicle entered FORM because of stale fuel, to maintain engine lubrication, or for both reasons.[39]

61.     Similarly, there is no time approximation whatsoever as to what FCA means when it adds that "[o]il refresh may take significantly longer in freezing temperatures."[40]

62.     Despite these ambiguities, it is clear that the Defect is particularly problematic during the winter season. FCA acknowledges the Class Vehicles' seasonal deficiencies in the below post which notes, among other things, that "[s]ome customers have commented about repeated or extended incidents of Fuel Oil Refresh Mode (FORM) during the winter season" and "in this case, FORM will return as long as the weather remains cold. We have high confidence that these frustrations will be resolved when the weather becomes warmer."[41]

---

[39] The manuals of both model years suggest that owners may exit FORM "by adding a minimum of four gallons of new fuel to the vehicle's fuel tank." However, the manuals go on to reveal that "if the vehicle enters Fuel and Oil Refresh Mode to maintain engine lubrication, adding fuel will not exit the mode sooner." *Id*. at 39; https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf, page 37 (accessed 1/4/2023)

[40] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2022/Wrangler_4xe/P133041_22_JL_H_SU_EN_USC_DIGITAL.pdf at 40 (last accessed 1/4/2023)

[41] https://www.4xeforums.com/threads/fuel-and-oil-refresh-mode.210/ (last accessed 1/4/2023)



#512  ·  Mar 18, 2022

Hello all. We want to reach back out and provide further insight here, as we see that there are still conversations surrounding FORM. Our internal engineers have comprised the following details and we encourage you all to take a look. We have also included the link to the updated Owner's Manual which now reflects the changes to the section marked "Fuel and Oil Refresh Mode".

Thanks, Jeep Cares

**Further information on the operation of Fuel Oil Refresh Mode (FORM) in the Wrangler 4xe**

**What is FORM?**

Some customers have commented about repeated or extended incidents of Fuel Oil Refresh Mode (FORM) during the winter season. If this is the first time you're hearing about FORM, please refer first to the owner's manual information:
https://msmownerassets.z13.web.core...ler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf

The purpose of this message is to better communicate how the oil dilution portion of FORM works, why some people see it frequently but others don't, and how to get Electric drive mode back. We won't discuss the stale fuel or spark maintenance portions of FORM here, because they are more straightforward and not seasonal in nature.

JeepCares
Registered
Joined Mar 18, 2021
298 Posts

27



**What is happening in the engine?**

Oil dilution FORM exists to reduce the possibility of engine damage caused by contaminants diluted in the engine oil. The contaminant of primary concern is gasoline, since it's continually injected directly into the combustion chamber while running. Although the 2.0-liter turbo 4-cylinder engine in the Wrangler 4xe is manufactured to precise tolerances, piston-ring-to-cylinder-bore sealing varies with engine operating temperature. Sealing is optimized for normal operating temperature. It's normal for some gasoline to make its way past the piston rings when the engine is cold. When the engine becomes warm, the piston rings expand and seal more tightly. Gasoline evaporates out of the hot engine oil, is routed through the Positive Crankcase Ventilation (PCV) system, and is ultimately used to make power.

**Is the Wrangler 4xe different from other vehicles?**

Oil dilution happens in all internal combustion engines. In conventional vehicles, trips of moderate length are enough to resolve the condition. This is why ICE vehicle owners' manuals recommend frequent oil changes in vehicles used for short trips. In Plug-in Hybrid vehicles, some use cases lead to many cold engine startups but little or no engine operation at normal temperature. One example is a customer who uses their Plug-in Hybrid Electric Vehicle (PHEV) just like a Battery Electric Vehicle (BEV), except for 0 - 15 minutes' duration ICE operation during most drive cycles. This short engine operation might come during remote start to warm the cabin, or a short high-speed portion of an otherwise all-electric commute. With that type of usage, especially while the outdoor temperature is cold, it's possible for 100% of engine runtime to occur with the engine well below normal operating temperature. Gasoline dilutes into the oil whenever the engine runs, but never evaporates out again. Over time, the contamination level grows.

You won't see features like FORM in BEV's or HEV's, because they're not subject to this use case. But in PHEVs from other manufacturers, you'll see warnings like "Low Engine Use Mode," "Maintaining Hybrid mode to protect engine," or "Engine Maintenance Mode," which all do the same thing as FORM.



**How does the vehicle "know" about dilution? What does it do about it?**

It's not practical to directly measure the proportion of gasoline diluted in the oil of a running engine. Before the launch of the Wrangler 4xe, Stellantis engineers built a model which accurately predicts the rate of dilution and evaporation inside the engine. This model runs at all times in the Wrangler's computers, and is based mainly on engine oil temperature, engine load and engine runtime. This is why it's important never to reset your Oil Life Indicator, if you have not changed the oil. To do that would introduce a large error in the modeled vs. actual dilution, and increase the probability of engine damage. Wrangler 4xe owners who encounter dilution FORM have commented that their engine oil smells like gasoline. This indicates that the dilution model is correctly identifying and mitigating a potentially damaging situation.

Dilution FORM in the Wrangler 4xe behaves differently, depending on modeled dilution level.

· Step 0: Normal Operation: Below a bottom threshold, vehicle operation is normal.

· Step 1: Moderate fuel dilution: Between the bottom and middle thresholds, silent start allows electric operation during a drive until the first ICE start. After that, you'll see the FORM message and the ICE will continue running until you shut the car off.

· Step 2: More fuel dilution: Between the middle and top thresholds, EV operation is not allowed. The ICE will start when you power up the vehicle and remain running until you shut down, or the bottom threshold is reached, whichever comes first.

· Step 3: More fuel dilution: Above the top threshold, EV operation is not allowed, and the vehicle will instruct you to perform an oil change.



Search Community

Depending on outside temperature and how the vehicle is being operated, it could climb or descend this ladder. Based on thorough review of feedback from dealership service departments, directly from customers through Jeep Wave, and from social media postings this winter, Jeep believes some Wrangler 4xe customers' engines are rarely warming fully to operating temperature. For this reason, oil dilution is staying between the bottom and middle thresholds ("Step 1") for extended periods of time in some vehicles operating in cold climates. The user's experience is therefore similar to frequently leaving and re-entering dilution FORM. Some customers may also be experiencing extended periods in "Step 2." Jeep Engineering and Jeep Wave are not aware of any cases where FORM is acting differently than designed, or where an unrelated hardware issue is exacerbating FORM duration or frequency.

**How can I get Electric mode back?**

The use case which leads to this level of dilution can vary, but the path to resolution is always the same:

· Start the engine and allow engine oil to reach normal operating temperature. 169°F (76°C) is the minimum, but normal operating temperature is above 194°F (90°C). Elevated speed and load will warm the engine oil most quickly.

· Continue running the engine until FORM is no longer shown in the Message Center of the instrument cluster. Depending on the dilution level, oil temperature and outside temp, this can take from 20 minutes to 2.5 hours.

· In case the above steps are not possible, change the engine oil and reset the oil life indicator.

· Never reset the oil life indicator without changing the engine oil.



63.    Stating that the Defect will fade away and electric-only operation will return once the weather gets warmer constitutes a wholly inadequate and, by definition, short-term solution to a major problem.

64.    Defendant's suggestions for getting the vehicle out of FORM, namely driving for long periods of time in gas-only mode, defeats the purpose and the gains from electric-only or electric-assisted driving especially when FORM does

not disable or promptly returns. Defendant's advertisements and promotional materials about the Class Vehicles' 21 or 25-miles of electric-only range do not mention that any electric-only range is completely unavailable when FORM manifests, which the manuals of all Class Vehicles acknowledge. Owners have zero electric-only range during colder temperatures when FORM manifests.

65.    The owner's manual information for FORM, for all Class Vehicles, are now virtually identical in their discussion of FORM.

GETTING TO KNOW YOUR INSTRUMENT PANEL    **39**

### Fuel And Oil Refresh Mode

Since it is possible to operate this vehicle for extended periods of time without running the gas engine, the fuel within the vehicle's fuel tank can become stale or the engine oil's lubricating properties can be reduced. To prevent engine and/or fuel system damage due to stale fuel, as well as maintaining internal engine lubrication, this vehicle is equipped with a Fuel and Oil Refresh Mode.



**Fuel and Oil Refresh Mode Message**

The vehicle will automatically enter into the Fuel and Oil Refresh Mode to minimize potential for stale fuel, and to ensure lubrication of internal engine components. When operating in this mode, the gas engine will run to provide vehicle propulsion (electric only operation is inhibited). A message will be displayed in the instrument cluster whenever Fuel and Oil Refresh Mode is active.

The vehicle will automatically exit the Fuel and Oil Refresh Mode when fuel and lubrication conditions have been satisfied. If the vehicle enters Fuel and Oil Refresh Mode, due to fuel which has been in the fuel tank for a long period of time (becoming stale fuel), the engine will run whenever the vehicle is operational (no electric only operation) until the low fuel level warning is activated. It is also possible to exit the Fuel and Oil Refresh Mode sooner by adding a minimum of four gallons of new fuel to the vehicle's fuel tank.

**NOTE:**
If the vehicle enters Fuel and Oil Refresh Mode to maintain engine lubrication, adding fuel will not exit the mode sooner.

**2022 Jeep Wrangler 4xe, with yellow boxes added to highlight text.**

## Fuel And Oil Refresh Mode

Since it is possible to operate this vehicle for extended periods of time without running the gas engine, the fuel within the vehicle's fuel tank can become stale or the engine oil's lubricating properties can be reduced. To prevent engine and/or fuel system damage due to stale fuel, as well as maintaining internal engine lubrication, this vehicle is equipped with a Fuel and Oil Refresh mode.

The vehicle will automatically enter into the Fuel and Oil Refresh mode to minimize potential for stale fuel, and to ensure lubrication of internal engine components. When operating in this mode, the gas engine will run to provide vehicle propulsion (electric only operation is inhibited). A message will be displayed in the instrument cluster whenever Fuel and Oil Refresh mode is active.

The vehicle will automatically exit the Fuel and Oil Refresh mode when fuel and lubrication conditions have been satisfied. If the vehicle enters Fuel and Oil Refresh mode, due to fuel which has been in the fuel tank for a long period of time (becoming stale fuel), the engine will run whenever the vehicle is operational (no electric only operation) until the low fuel level warning is activated. It is also possible to exit the Fuel and Oil Refresh mode sooner by adding a minimum of four gallons of new fuel to the vehicle's fuel tank.

**NOTE:**
If the vehicle enters Fuel and Oil Refresh mode to maintain engine lubrication, adding fuel will not exit the mode sooner.



**Fuel and Oil Refresh Mode Message**

**2023 Jeep Wrangler 4xe, with yellow boxes added to highlight text.**

66.     The owner's manuals sections on FORM for the 2022-2023 Jeep Grand Cherokee are also virtually identical, save for instrument gauge differences, to their Wrangler 4xe counterparts.

33

## Fuel And Oil Refresh Mode

Since it is possible to operate this vehicle for extended periods of time without running the gas engine, the fuel within the vehicle's fuel tank can become stale or the engine oil's lubricating properties can be reduced. To prevent engine and/or fuel system damage due to stale fuel, as well as maintaining internal engine lubrication, this vehicle is equipped with a Fuel and Oil Refresh Mode.



**Fuel And Oil Refresh Mode Message**

The vehicle will automatically enter into the Fuel and Oil Refresh Mode to minimize potential for stale fuel, and to ensure lubrication of internal engine components. When operating in this mode, the gas engine will run to provide vehicle propulsion (electric only operation is inhibited). A message will be displayed in the instrument cluster whenever Fuel and Oil Refresh Mode is active.

The vehicle will automatically exit the Fuel and Oil Refresh Mode when fuel and lubrication conditions have been satisfied. If the vehicle enters Fuel and Oil Refresh Mode, due to fuel which has been in the fuel tank for a long period of time (becoming stale fuel), the engine will run whenever the vehicle is operational (no electric only operation) until the low fuel level warning is activated. It is also possible to exit the Fuel and Oil Refresh Mode sooner by adding a minimum of four gallons of new fuel to the vehicle's fuel tank.

**NOTE:**

If the vehicle enters Fuel and Oil Refresh Mode to maintain engine lubrication, adding fuel will not exit the mode sooner.

**2022 Jeep Grand Cherokee 4xe, with yellow boxes added to highlight text.**

GETTING TO KNOW YOUR INSTRUMENT PANEL   **37**

- Electric cabin heating capacity limits (or electric cabin heater fault) - Unlike Battery Electric Vehicles (BEV's), the PHEV can warm the cabin more efficiently with engine heat when operating below 15°F outside temperature.
- HV battery, motors or contactors over temperature - This is a temporary hardware protection feature. Vehicle performance will resume once protection is no longer required. If the vehicle performance is accompanied with a Malfunction Indicator Lamp (MIL) ⬛, have the vehicle serviced at an authorized dealership.

**Component protection that can inhibit Electric Mode**

- HV battery undervoltage - Sustained EV operation at high speed, especially with aftermarket wheels and tires, can induce this.
- Other electric propulsion system faults indicated by a MIL - Please see an authorized dealer for service.
- Fuel and Oil Refresh Mode - See the following section.

**Fuel And Oil Refresh Mode**

Since it is possible to operate this vehicle for extended periods of time without running the gas engine, the fuel within the vehicle's fuel tank can become stale or the engine oil's lubricating properties can be reduced. To prevent engine and/or fuel system damage due to stale fuel, as well as

maintaining internal engine lubrication, this vehicle is equipped with a Fuel and Oil Refresh Mode.



**Fuel and Oil Refresh Mode Message**

The vehicle will automatically enter into the Fuel and Oil Refresh Mode to minimize potential for stale fuel, and to ensure lubrication of internal engine components. When operating in this mode, the gas engine will run to provide vehicle propulsion (electric only operation is inhibited). A message will be displayed in the instrument cluster whenever Fuel and Oil Refresh Mode is active.

The vehicle will automatically exit the Fuel and Oil Refresh Mode when fuel and lubrication conditions have been satisfied. If the vehicle enters Fuel and Oil Refresh Mode, due to fuel which has been in the fuel tank for a long period of time (becoming stale fuel), the engine will run whenever the vehicle

is operational (no electric only operation) until the low fuel level warning is activated. It is also possible to exit the Fuel and Oil Refresh Mode sooner by adding a minimum of four gallons of new fuel to the vehicle's fuel tank.

**NOTE:**

If the vehicle enters Fuel and Oil Refresh Mode to maintain engine lubrication, adding fuel will not exit the mode sooner.

**2023 Jeep Grand Cherokee 4xe, with yellow boxes added to highlight text.**

67.    Due to the Defect, Defendant's omissions regarding the Defect, and Defendant's misleading representations surrounding the Defect, consumers paid a substantial premium for plug-in hybrid vehicles that often lack electric-only or electric-assisted propulsion.

Defendant Misrepresented the Capabilities of the Class Vehicles and Omitted the Defect

68.    Defendant omitted the Defect from the promotional materials.

69.    Defendant eventually admitted to the Defect by altering the language of the 2022 Jeep Wrangler 4xe manual, as discussed above, to acknowledge that, once the vehicle enters the FORM cycle, hours of gasoline-only operation are needed before the user could retain access to electric-only operability.[42] This constitutes a significant departure from Defendant's position in the 2021 manual, that electric-only operation could return after only "a period of up to 20 minutes when fully warm whenever the vehicle is operational,"[43] to "up to 2.5 hours whenever the vehicle is operation ( fully warm whenever the vehicle is operation (no electric only operation)." when the Defect manifests. This change is reflected

---

[42] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf, page 37 (accessed 1/4/2023)

[43] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2021/Wrangler_4xe/P125757_21_JL_H_SU_EN_USC_DIGITAL.pdf, page 37 (accessed 1/4/2023)

in the manuals of all model years of the Class Vehicles, and again acknowledge

that electric-only driving is unavailable when the Defect manifests.

If the vehicle enters Fuel and Oil Refresh Mode to
maintain engine lubrication properties, the engine
may run for a period of up to 2.5 hours when fully
warm whenever the vehicle is operational (no
electric only operation). If the vehicle is shut down
before conditions to exit the refresh mode have
been satisfied, the engine may run for additional
time on subsequent trips. Oil refresh may take
significantly longer in freezing temperatures.

*1 2022 Jeep Wrangler 4xe*

If the vehicle enters Fuel and Oil Refresh mode to maintain
engine lubrication properties, the engine may run for a
period of up to 2.5 hours when fully warm whenever the
vehicle is operational (no electric only operation). If the
vehicle is shut down before conditions to exit the refresh
mode have been satisfied, the engine may run for
additional time on subsequent trips. Oil refresh may take
significantly longer in freezing temperatures.

*2 2023 Jeep Wrangler 4xe*

If the vehicle enters Fuel and Oil Refresh Mode to maintain
engine lubrication properties, the engine may run for a
period of up to 2.5 hours when fully warm whenever the
vehicle is operational (no electric only operation). If the
vehicle is shut down before conditions to exit the refresh
mode have been satisfied, the engine may run for
additional time on subsequent trips. Oil refresh may take
significantly longer in freezing temperatures.

*3 2022 Jeep Grand Cherokee 4xe*

If the vehicle enters Fuel and Oil Refresh Mode to
maintain engine lubrication properties, the engine
may run for a period of up to 2.5 hours when fully
warm whenever the vehicle is operational (no
electric only operation). If the vehicle is shut down
before conditions to exit the refresh mode have
been satisfied, the engine may run for additional
time on subsequent trips. Oil refresh may take
significantly longer in freezing temperatures.

*4 2023 Jeep Grand Cherokee 4xe*

70.     The updated manuals also differ from its predecessor by acknowledging that freezing temperatures result in a "significantly longer" period of gasoline powered operation before electric-only operation becomes available.[44]

71.     Despite this knowledge, Defendant has failed to act to notify all Class Vehicle owners of its omissions, remedy its misrepresentations regarding the Class Vehicles, or implement a recall to remedy or eliminate the Defect.

72.     To date, on information and belief, Defendant has issued one technical service bulletin ("TSB") directly referencing FORM.

73.     Dated December 23, 2022, Defendant's TSB only applies to 2022 Jeep Wrangler 4xe vehicles and is meant to address the following customer complaints: "Vehicle may not be able to enter electric mode driving while Fuel Oil Refresh Mode (FORM) is active[,]" and/or "FORM staying on too long."

74.     The TSB instructs dealer technicians to update the 2022 Jeep Wrangler 4xe's powertrain control module (PCM), the hybrid control processor (HCP), the auxiliary hybrid control processor (AHCP) also known as the Power Inverter Module (PIM), and the Transmission Control Module (TCM).

75.     On information and belief, application of these updates has proved ineffective.

---

[44] https://msmownerassets.z13.web.core.windows.net/assets/publications/en-us/Jeep/2022/Wrangler_4xe/P133041_22_JL_H_SU_EN_USC_DIGITAL.pdf, page 40 (1/4/2023)

76.    In addition, Defendant has recently issued a Customer Satisfaction Notification only directed toward certain 2023 Jeep Wrangler 4xe owners. On information and belief, this notification was received by owners on or around March 31, 2023.

77.    The Customer Satisfaction Notification instructs 2023 Jeep Wrangler 4xe owners to visit a dealership because "[t]he full electric mode on your vehicle may not be available due to an incorrectly enabled engine maintenance mode designed to protect your engine from failure due to diluted oil." The notification makes no mention of FORM, the conditions that may trigger it, or how the stated solution—"reprogram[ming] several electric modules"—will remedy the Defect.

78.    Given the propensity of FORM to activate in, but not exclusively, cold weather the proposed remedy may prove illusory as Spring and Summer temperatures begin to set.

79.    An image of the Customer Satisfaction Notification follows below:



# CUSTOMER SATISFACTION NOTIFICATION
## Electric Vehicle Mode

This notice applies to your vehicle.

2023 Jeep Wrangler
1C4JJXP64PW524327

**23A**

At FCA US LLC, we recognize that the success of our business depends on the satisfaction of our customers. We are constantly monitoring the quality of our products and looking for opportunities to improve our vehicles even after they are sold. Because your long-term satisfaction is important to us, we are contacting you on important improvements we would like to make to your vehicle [1]. This will be done at no charge to you.

We are recommending the following improvements be performed on certain 2023 Jeep Wrangler PHEV vehicles.

### WHY DOES MY VEHICLE NEED REPAIRS?
The full electric vehicle mode on your vehicle may not be available due to an incorrectly enabled engine maintenance mode designed to protect your engine from failure due to diluted oil.

### HOW DO I RESOLVE THIS CUSTOMER SATISFACTION NOTIFICATION?
FCA US will repair your vehicle free of charge (parts and labor). To do this, your dealer will reprogram several electronic modules. The estimated repair time is about 30 minutes. In addition, your dealer will require your vehicle for proper check-in, preparation, and check-out during your visit, which may require more time. Your time is important to us, so we recommend that you schedule a service appointment to minimize your inconvenience. Please bring this letter with you to your dealership.

## YOUR SCHEDULING OPTIONS

1. **RECOMMENDED OPTION**
   Call your authorized Chrysler / Dodge / Jeep / RAM Dealership

2. Call the FCA Recall Assistance Center at **1-800-853-1403**. An agent can confirm part availability and help schedule an appointment

3. Visit recalls.mopar.com, scan the QR code below, or download the Mopar Owner's Companion App.

**TO SCHEDULE YOUR FREE REPAIR,**
**CALL YOUR CHRYSLER, DODGE, JEEP OR RAM DEALER TODAY**

### WHAT IF I ALREADY PAID TO HAVE THIS REPAIR COMPLETED?
If you have already experienced this specific condition and have paid to have it repaired, you may visit **www.fcarecallreimbursement.com** to submit your reimbursement request online. [2] Once we receive and verify the required documents, reimbursement will be sent to you within 60 days. If you have had previous repairs performed and/or already received reimbursement, you may still need to have the repair performed.

We apologize for any inconvenience, but are sincerely concerned about your satisfaction. Thank you for your attention to this important matter.

Customer Assistance/Field Operations
FCA US LLC

Get access to recall notifications, locate your nearest dealer, and more through this website or Mopar Owner's Companion App. You will be asked to provide your Vehicle Identification Number (VIN) to protect and verify your identity.

**DEALERSHIP INSTRUCTIONS**
Please reference CSN 23A.

0000283/#106112/23A-STD

40

80.     On December 14, 2022 Plaintiff Crowell sent Defendant a notice letter, informing FCA of his intent to bring claims unless FCA remedied its misconduct. Despite the letter arriving on December 20, 2022, Defendant has provided no response.

81.     On March 6, 2023, the other Plaintiffs sent Defendant a notice letter, informing FCA of their intent to bring the below-enumerated claims unless FCA remedied its misconduct. Despite the letter arriving on March 9, 2023, FCA provided no response.

**Plaintiffs' Factual Allegations**

Plaintiff Jesse Crowell

82.     Plaintiff Jesse Crowell is a citizen and resident of Mt. Laurel, New Jersey.

83.     On or about May 8, 2021, Plaintiff Crowell purchased a 2021 Jeep Wrangler Unlimited 4xe from Keene Dodge Chrysler Jeep Co., located at 3707 Norrisville Rd., Jarrettsville, MD 21084, for a total price of $78,621.08.

84.     Plaintiff Crowell made the decision to purchase the 2021 Jeep Wrangler 4xe after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Crowell chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles.

85.     Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Crowell of the Defect. Plaintiff Crowell reasonably expected that the Class Vehicle, would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

86.     Plaintiff Crowell purchased the Class Vehicle for personal use. Plaintiff Crowell has always attempted to use the Class Vehicle in the normal and expected manner.

87.     On or about October 2021, when his vehicle had roughly 5,000 miles, Plaintiff Crowell first experienced the Defect and was unable to drive off on electric power alone. While the FORM message occasionally disappeared, Plaintiff Crowell was largely deprived of the Class Vehicle's electric-only or electric-assisted operation between October 2021 and February 2022.

88.     Plaintiff Crowell called his local dealership on or around November 2021 to inquire about potentially leaving the car at the dealership while they figured out the problem but was informed there was no loaner car available. He therefore declined to leave the car with the dealership. He was told that he would be contacted if a loaner became available. Plaintiff Crowell was never contacted about a loaner vehicle.

89.     Plaintiff Crowell was aware from Facebook pages discussing the Jeep 4xe that other dealers told customers there was no fix for the Defect and that the Class Vehicles were performing normally. Plaintiff Crowell did not press his dealer about a loaner vehicle because of the experience others were reporting online, as well as the fact that he needed the car for his 12-hour workdays.

90.     On or about December 4, 2021, Plaintiff Crowell changed the oil himself on his Class Vehicle. The next day, the FORM message again displayed on his dashboard. Plaintiff Crowell ran the Class Vehicle for more than three hours in an attempt to make the FORM message disappear, but the FORM message remained.

91.     On or about June 20, 2022, Plaintiff Crowell visited the dealership for it to address, among other concerns, electric-mode unavailability in his vehicle. The dealership found error codes P04EC and P04EF that, upon information and belief, are related to the Evaporation Emission Control (EVAP) system.[45] The dealership did not address FORM and the Defect continues to be a problem for Plaintiff Crowell.

92.     Moreover, without being offered a loaner vehicle, Plaintiff Crowell has limited time to visit the dealership because of his 12-hour workdays and has not gone back since.

---

[45] *See* https://static.nhtsa.gov/odi/tsbs/2021/MC-10221288-9999.pdf

93.     Plaintiff Crowell considered purchasing the diesel engine Wrangler rather than the 4xe. He ultimately decided on the Class Vehicle because his drive to work is eleven miles and he wished to take advantage of the all-electric commute that Defendant's representations led him to believe was possible with the Class Vehicles.

94.     Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Crowell did not receive the benefit of his bargain. Had Plaintiff Crowell known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, even when the battery was charged, Plaintiff Crowell would not have purchased his Class Vehicle or would have paid less for it.

Plaintiff Lonnie Heeter

95.     Plaintiff Lonnie Heeter is a citizen and resident of Granger, Indiana.

96.     On or about December 20, 2021, Plaintiff Heeter leased a Jeep Wrangler Unlimited 4xe from Tyler's Inc. located at 1102 S 11th St., Niles, MI 49120, for a three-year term and makes monthly payments of $469.71.

97.     Plaintiff Heeter made the decision to lease his Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Heeter chose the Class Vehicle based primarily on

its represented range, and also based on FCA's reputation for manufacturing quality vehicles.

98.    Prior to his lease, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Heeter of the Defect. Plaintiff Heeter reasonably expected that the Class Vehicle would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

99.    Plaintiff Heeter leased his Class Vehicle for personal use. Plaintiff Heeter has always attempted to use his Class Vehicle in the normal and expected manner.

100.   When his vehicle had roughly 1,000 miles, in or around January 2022 Plaintiff Heeter first experienced the Defect and was unable to drive off of electric power alone. The conditions that cause the Defect to manifest are related to cold temperatures, particularly when the outside temperature is at 30 degrees Fahrenheit and below.

101.   Cumulatively, Plaintiff Heeter has been unable to use electric-only or electric-assisted mode for months. The Defect has most often occurred during the winter months, as the lower temperatures keep the Class Vehicle in a perpetual state of "Fuel and Oil Refresh" mode.

102.   When Plaintiff Heeter communicated with the dealer about the Defect on or about June 21, 2022 he was simply told there were no recalls available to address the Defect. Plaintiff Heeter therefore had a Class Vehicle with limited functionality for significant parts of the year.

103.   The inability of Plaintiff Heeter's vehicle to use electric power also presents safety issues. Plaintiff Heeter has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

104.   The Defect also prevents Plaintiff Heeter from using the Class Vehicle's remote start feature to warm the vehicle prior to entering.

Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Heeter did not receive the benefit of his bargain. Had Plaintiff Heeter known that the vehicle's electric-only or electric-assisted capacity was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Heeter would not have purchased the Class Vehicle or would have paid less for it.

Plaintiff Peter Nau

105.   Plaintiff Peter Nau is a citizen and resident of North Liberty, Iowa.

46

106.   On or about April 10, 2021, Plaintiff Nau purchased a 2021 Jeep Wrangler Unlimited 4xe from Capper Auto Center, Inc. located at 1738 East Washington, Washington, IA 52353, for a total price of $59,704.75.

107.   Plaintiff Nau made the decision to purchase his Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Nau prioritized an environmentally friendly vehicle for winter driving because his commute includes country roads that are not consistently plowed following snowfall. During the Spring, Summer, and Fall months, Plaintiff Nau primarily travels the six and a half miles to and from work on his bike. Given the Class Vehicle's advertised range, Plaintiff Nau expected to drive in electric-only or electric-assisted electric-only mode mostly during the winter months. Plaintiff Nau chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles.

108.   Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Nau of the Defect. Plaintiff Nau reasonably expected that the Class Vehicle would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

109.    Plaintiff Nau purchased the Class Vehicle for personal use. Plaintiff Nau has always attempted to use the Class Vehicle in the normal and expected manner.

110.    Soon after purchase, when his Class Vehicle had about twenty miles on the odometer, Plaintiff Nau first experienced the Defect and was unable to drive off of electric power alone. The conditions that cause the Defect to manifest are related to cold temperatures, particularly when the outside temperature is at 30 Fahrenheit degrees and below.

111.    In an effort to take his vehicle out of FORM mode, Plaintiff Nau visited a Jeep dealership in Winter 2021 and changed his oil prior to his recommended service date, with 30 to 35 percent of oil life remaining, since that was the only solution offered but this did not solve the problem.

112.    Following this visit, at or around December 2021, Plaintiff Nau opened a STAR case with Jeep. Plaintiff Nau was offered a free set of replacement keys and other offers that had no relation to, or solution for, FORM. Following hours with Jeep representatives, Plaintiff Nau was told the Class Vehicle was working as designed and ceased communicating with him.

113.    Between December 2021 and April 2022, Plaintiff Nau visited two area dealerships, Capper CDJR in Washington, Iowa, and Deery Brothers Motors of Iowa City, Iowa, to try to resolve FORM but the problem persisted.

48

114.   Cumulatively, Plaintiff Nau has been unable to use electric-only or electric-assisted mode for months. The Defect has most often occurred during the winter months, as the lower temperatures keep the Class Vehicle in a perpetual state of "Fuel and Oil Refresh" mode.

115.   The inability of Plaintiff Nau's vehicle to use electric power also presents safety issues. Plaintiff Nau has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

116.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Nau did not receive the benefit of his bargain. Had Plaintiff Nau known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Nau would not have purchased the Class Vehicle or would have paid less for it.


Plaintiff Bener Saka

117.   Plaintiff Bener Saka is a citizen and resident of Wantagh, New York.

118.   On or about May 21, 2021, Plaintiff Saka leased a 2021 Jeep Wrangler Unlimited 4xe from Security Dodge Chrysler Jeep RAM located at 345

49

Merrick Road, Amityville, New York 11701 for a three-year term, and makes monthly payments of $489.81.

119.    Plaintiff Saka made the decision to lease his Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 25-mile electric range.[46] Plaintiff Saka chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles. For Plaintiff Saka, the 25-mile advertised range perfectly fit into his commute, since his trips to and from work were about twelve miles each way. Plaintiff Saka anticipated that approximately ninety percent of his driving could be done on electric power alone.

120.    Prior to his lease, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Saka of the Defect. Plaintiff Saka reasonably expected that the Class Vehicle would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

121.    Plaintiff Saka leased the Class Vehicle for personal use. Plaintiff Saka has always attempted to use the Class Vehicle in the normal and expected manner.

---

[46] See https://www.motortrend.com/news/2021-jeep-wrangler-4xe-electric-range-and-fuel-economy/ (accessed 4/4/2023).

122.   Soon after his lease began, when the odometer read about 250 miles, Plaintiff Saka first experienced the Defect and was unable to drive off of electric power alone. After a two-month delay attempting to secure a service appointment, Plaintiff Saka was able to bring his vehicle to the dealership for routine maintenance and to attempt to address issues with the battery, including its inability to hold a charge, dropping in the winter months to the 21-22-mile range. By this point, the Class Vehicle had already been in FORM. The dealership had Plaintiff Saka's vehicle for five days and only performed a software update that did not cure the Defect.

123.   Plaintiff Saka contacted the dealership on or around the first week of March 2022 to again attempt to address FORM that continued to be present in his vehicle, and which was not fixed since the December 2021 service appointment. Plaintiff Saka's service appointment was scheduled for April 5, 2022 and was told a loaner vehicle would be provided.

124.   On April 4, 2022, Plaintiff Saka received a call at 8 PM from Security Jeep canceling his appointment for the next day due to broken lifts at the service center. Plaintiff Saka's service appointment was rescheduled for May 4, 2022 and was again told a loaner vehicle would be provided.

125.   On May 3, 2022, Plaintiff Saka received a call at 9 PM from Security Jeep canceling his appointment for the next day due to the arrival of a large parts

shipment and pending repairs for other vehicles. Plaintiff Saka's appointment was rescheduled for May 18, 2022.

126.    On May 18, 2022, Plaintiff Saka took his vehicle to Security Jeep to address the pending unresolved issues from his first visit in December 2021. When he attempted to receive his loaner car, he was told by staff that a loaner car was not available for him since his vehicle was only in for a diagnostic check, not for repair. Frustrated by his experience, Plaintiff Saka asked for his vehicle to be brought out so he could leave. He was later told the Security Jeep dealership would no longer service his vehicle.

127.    On or about July 20, 2022, Plaintiff Saka sent a letter to FCA via certified mail, detailing his ownership experience thus far and asking for relief. FCA did not respond.

128.    On September 6, 2022, Plaintiff Saka then took his vehicle for servicing to Merrick Jeep, where the dealership performed another software update on his vehicle in response to Plaintiff's FORM concern. The update did not resolve the Defect.

129.    On or about October 2022, Plaintiff Saka called Jeep's customer support line to request a replacement or buyback for his vehicle. Jeep declined Plaintiff's request.

130.    On January 4, 2023, Plaintiff Saka returned to Merrick Jeep, again raising the concern that his vehicle was unable to use electric-only or electric-assisted mode due to FORM. Plaintiff Saka's vehicle received another software update. The software update did not resolve the Defect.

131.    On or about March 1, 2023, Plaintiff Saka again called Jeep's customer support team to request a replacement or buyback for his vehicle. Jeep declined Plaintiff's request.

132.    On or about March 7, 2023, Plaintiff Saka reiterated his concerns about his vehicle to Jeep's customer support team. On or about March 13, 2023, Plaintiff Saka wrote to Jeep Wave to inform Defendant's representatives that his vehicle remained in FORM. As of April 3, 2023, from Plaintiff Saka's most recent correspondence with Jeep Wave, Plaintiff's vehicle had been in FORM for the previous twenty-three days. Jeep Wave did not respond.

133.    The inability of Plaintiff Saka's vehicle to use electric power also presents safety issues. Plaintiff Saka has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

134.    The Defect also prevents Plaintiff Saka from using the vehicle's remote start feature to warm the vehicle prior to entering.

53

135.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Saka did not receive the benefit of his bargain. Had Plaintiff Saka known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Saka would not have leased the Class Vehicle or would have paid less for it.

Plaintiff Robert Thompson

136.   Plaintiff Robert Thompson is a citizen and resident of Tucker, Georgia.

137.   On or about July 7, 2021, Plaintiff Thompson purchased a 2021 Jeep Wrangler 4xe from Troncalli CDJR located at 818 Atlanta Rd., Cumming, GA 30040, for a total price of $67,984.24.

138.   Plaintiff Thompson made the decision to purchase his Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Thompson chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles. He had previously owned a Jeep Wrangler, and after considering competing vehicles from Toyota, as well as the supply chain and availability issues of that brand, Plaintiff Thompson decided to stay with a brand

he was familiar with. Lastly, Plaintiff Thompson works from home and anticipated low gasoline consumption, if any, given the short trips he envisioned taking off on electric power alone.

139.   Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Thompson of the Defect. Plaintiff Thompson reasonably expected that the Class Vehicle would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

140.   Plaintiff Thompson purchased the Class Vehicle for personal use. Plaintiff Thompson has always attempted to use the Class Vehicle in the normal and expected manner.

141.   When his vehicle had approximately 10,500 miles, Plaintiff Thompson's vehicle went into FORM. The conditions that gave rise to FORM in Plaintiff Thompson's vehicle were cold weather, and Plaintiff Thompson's vehicle stayed in FORM for a day. Plaintiff Thompson contacted the dealership about FORM and was told the solution would be a software update.

142.   Plaintiff Thompson visited the dealership again when his vehicle had 12,707 miles, on or about February 16, 2023, to address two recalls: one related to loss of motive power and another to address a water pump coolant leak. While at

the dealership, a number of parts had to be ordered for Plaintiff Thompson's vehicle because they were unavailable at the time.

143.    Plaintiff Thompson received an update on February 21, 2023 from the dealership, informing him of delays in receiving the ordered parts. On March 3, 2023, Plaintiff Thompson inquired about the delayed parts and was told parts would not arrive until March 8, 2023. On March 4, Plaintiff Thompson again communicated with his dealership for an update on the parts and was told, on March 5, 2023, that parts had been further pushed back to March 22, 2023. Plaintiff Thompson asked the dealership if he was okay to drive even though the check engine light was on. The dealership responded: "Hybrid system might not work but gas side will work."

144.    The inability of Plaintiff Thompson's vehicle to use electric power also presents safety issues. Plaintiff has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

145.    Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Thompson did not receive the benefit of his bargain. Had Plaintiff Thompson known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery

was charged, Plaintiff Thompson would not have purchased the Class Vehicle or would have paid less for it.

Plaintiff Kenneth Forst

146.   Plaintiff Kenneth Forst is a citizen and resident of Grand Rapids, Minnesota.

147.   On or about March 4, 2022, Plaintiff Forst purchased a 2022 Jeep Wrangler Unlimited 4xe from Dondeligner Chrysler Dodge Jeep Ram located at 815 NW 4th St., Grand Rapids, MN 55744, for a total price of $70,354.98.

148.   Plaintiff Forst made the decision to purchase his Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Forst chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles.

149.   Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Forst of the Defect. Plaintiff Forst reasonably expected that the Class Vehicle would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

150.   Plaintiff Forst purchased the Class Vehicle for personal use. Plaintiff Forst has always attempted to use the Class Vehicle in the normal and expected manner.

151.   On or about May 12, 2022, when his vehicle had approximately 1,052 miles, Plaintiff Forst brought his vehicle in to the dealership and raised the issue of his vehicle running off of the gas engine only. The dealership found no issues with Plaintiff's vehicle, returned it to him, and advised Plaintiff Forst "to drive the vehicle on a long trip."

152.   The inability of Plaintiff Forst's vehicle to use electric power also presents safety issues. Plaintiff has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

153.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Forst did not receive the benefit of his bargain. Had Plaintiff Forst known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Forst would not have purchased the Class Vehicle or would have paid less for it.

Plaintiff Christopher Gittings

154.   Plaintiff Christopher Gittings is a citizen and resident of Helena,
Montana.

155.   On or about September 23, 2022, Plaintiff Gittings purchased a 2022
Jeep Wrangler 4xe from Lithia Chrysler Jeep Dodge of Great Falls located at 4025
10th Avenue S, Great Falls, MT 59405 for a total price of $65,342. On or about
October 13, 2022, Plaintiff Gittings also purchased a 2022 Jeep Grand Cherokee
4xe from Lithia Chrysler Jeep Dodge of Great Falls, for a total price of $68,465.

156.   Plaintiff Gittings made the decision to purchase his Class Vehicles
after considering FCA's representations about the Class Vehicles, including the
reported 21-mile electric range for the Jeep Wrangler 4xe and 25-mile electric
range for the Jeep Grand Cherokee 4xe. Considering that Montana did not have a
robust EV infrastructure, Plaintiff Gittings needed a vehicle that could switch
between EV and gas driving modes. Further, Plaintiff Gittings anticipated that
most of his driving would fall below the advertised range, but wanted the extended
range that gasoline provided for longer trips. Plaintiff Gittings chose the Class
Vehicles based primarily on their represented range, and also based on FCA's
reputation for manufacturing quality vehicles.

157.   Prior to his purchases, neither Defendant nor any of its agents, dealers,
or other representatives informed Plaintiff Gittings of the Defect in both Class

Vehicles. Plaintiff Gittings reasonably expected that the Class Vehicles would function normally as plug-in hybrid vehicles and in accordance with Defendant's specifications and representations.

158.   Plaintiff Gittings purchased the Class Vehicles for personal use. Plaintiff Gittings has always attempted to use the Class Vehicles in the normal and expected manner.

159.   Plaintiff Gittings' Class Vehicles operated properly until a cold snap occurred, on or around mid-December 2022. On December 30, 2022, Plaintiff Gittings visited the Lithia CDJR of Helena dealership to raise the issue that the 2023 Jeep Wrangler 4xe was not using the electric motor, only the gas engine. Dealership notes state the Class Vehicle "is driving as designed," though Plaintiff's vehicle received an oil and filter change. Plaintiff's vehicle operated properly for about three weeks before FORM again appeared on the dash.

160.   The inability of Plaintiff Gittings' vehicles to use electric power also presents safety issues. Plaintiff has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

161.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Gittings did not receive the benefit of his bargain.

Had Plaintiff Gittings known that the vehicles' electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Gittings would not have purchased the Class Vehicles or would have paid less for them.

Plaintiff Mike Kwiatkowsk

162.   Plaintiff Mike Kwiatkowski is a citizen and resident of Toledo, Ohio.

163.   On or about August 30, 2021, Plaintiff Kwiatkowski purchased a 2021 Jeep Wrangler Unlimited 4xe from Yark Automotive Group located at 6019 W Central Ave., Toledo, Oh 43615 for a total price of $59,605.

164.   Plaintiff Kwiatkowski made the decision to purchase his Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Kwiatkowski chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles. In addition, Mr. Kwiatkowski only lives three miles from work and was told he could drive to work off of electric power alone.

165.   Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Kwiatkowski of the Defect. Plaintiff Kwiatkowski reasonably expected that the Class Vehicle would function normally

as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

166.   Plaintiff Kwiatkowski purchased the Class Vehicle for personal use. Plaintiff Kwiatkowski has always attempted to use the Class Vehicle in the normal and expected manner.

167.   On or about January 12, 2022, when his vehicle had approximately 1,251 miles, Plaintiff Kwiatkowski visited the Yark CJDR dealership because electric mode was unavailable on his car whenever he tried selecting it. The dealership replaced the upstream oxygen sensor, as well as the engine oil and oil filter due to a rich mixture of fuel vapor in the oil.

168.   On or about Feb. 23, 2022, when his vehicle had approximately 1,535 miles, Plaintiff Kwiatkowski returned to the Yark CJDR dealership because his vehicle continued failing to operate in electric-only or electric-assisted mode. Though the previous repairs temporarily allowed for electric-only or electric-assisted operation, the problem had returned and the FORM notification displayed on Plaintiff Kwiatkowski's dashboard. The dealership noted that it had been about 200 miles since the previous oil change. Service notes indicate that the vehicle was driven at 50 MPH for 40 miles, with FORM remaining active. Service notes indicate that the vehicle was driven an additional 85.4 miles, at which point electric mode was again available.

169.    On or about December 7, 2022, when the vehicle had approximately 4,758 miles, Plaintiff Kwiatkowski returned to Yark CJDR because his vehicle was not operating in hybrid mode. The vehicle had been using only the gas engine for over a month and, when he was able to access electric power, his range dropped to fourteen miles. Service notes indicate the vehicle was again in FORM and would not run in hybrid or electric mode while FORM was active. After changing the oil and charging the battery, the battery range increased to twenty-four miles, but the vehicle was stuck in cabin heating or cooling mode, which service notes indicate also does not allow for hybrid/electric operation.

170.    The efficiency of Plaintiff Kwiatkowski's vehicle varies significantly throughout the year. During summer months, Plaintiff Kwiatkowsi is able to achieve up to forty miles-per-gallon. That figure drops to at or around seventeen miles-per-gallon during cold weather, which has been the case for the past six months. Plaintiff Kwiatkowski also has to pay $250 a year in registration fees because his vehicle is considered electric, even though he can't use it as a battery electric vehicle for six months out of the year.

171.    The inability of Plaintiff Kwiatkowski's vehicle to use electric power presents safety issues. Plaintiff has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is

greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

172.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Kwiatkowski did not receive the benefit of his bargain. Had Plaintiff Kwiatkowski known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Kwiatkowski would not have purchased the Class Vehicle or would have paid less for it.

Plaintiff Stephanie Gelber

173.   Plaintiff Stephanie Gelber is a citizen and resident of Getzville, New York.

174.   On or about September 18, 2021, Plaintiff Gelber leased a 2021 Jeep Wrangler 4xe from West Herr Chrysler Dodge Jeep located at 6200 S Transit Rd., Lockport, NY 14094, for a three-year term, making monthly payments of $475.52.

175.   Plaintiff Gelber made the decision to lease her Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Gelber chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing

quality vehicles. Had Plaintiff Gelber known that FORM would occur, and that its prescribed solution was to drive, using gasoline, for longer periods than the electric-only range allows, she would not have made the decision to lease her Class Vehicle. Any gains from electric-only or electric-assisted operation are, or potentially are, lost by the procedures needed to get the Class Vehicle out of FORM, to the extent those procedures even work or keep the Class Vehicle out of FORM.

176.   Prior to her lease, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Gelber of the Defect. Plaintiff Gelber reasonably expected that the Class Vehicle would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations, including that electric-only operation was available with only one percent of battery charge.

177.   Plaintiff Gelber leased the Class Vehicle for personal use. Plaintiff Gelber has always attempted to use the Class Vehicle in the normal and expected manner.

178.   On or about December 17, 2021, when her vehicle had approximately 1,421 miles, Plaintiff Gelber visited a certified Jeep dealership because she had sporadically available operation of her vehicle in electric-only mode, as the weather began to turn cold in or around November 2021. The dealership performed

recall and software work, but otherwise concluded that the vehicle operated as designed.

179.   On or about January 11, 2022, when her vehicle had approximately 1,774 miles, Plaintiff Gelber returned to the dealership because the vehicle would not operate in electric mode. Service notes reflect Plaintiff's attempt to remedy the Defect, including by taking long drives on the highway and short drives around town. Service notes also show that service technicians drove the vehicle for about twenty miles to try to get the vehicle out of FORM. After leaving Plaintiff Gelber's vehicle on idle for twenty-five more minutes, Plaintiff's vehicle was no longer in FORM.

180.   The dealership opened a STAR case while Plaintiff's vehicle was idle and was told that Plaintiff Gelber's vehicle was operating as designed. Following this service, Plaintiff Gelber was told there was no fix for FORM and so did not bring the vehicle back to address FORM, though the issue persists.

181.   The inability of Plaintiff Gelber's vehicle to use electric power presents safety issues. Plaintiff has noticed that, when the Defect manifests and the electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

182.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Gelber did not receive the benefit of her bargain. Had Plaintiff Gelber known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Gelber would not have purchased the Class Vehicle or would have paid less for it.

Plaintiff Jason Figley

183.   Plaintiff Jason Figley is a citizen and resident of Coraopolis, Pennsylvania.

184.   On or about December 5, 2022, Plaintiff Figley purchased a 2023 Jeep Wrangler 4xe from Cochran CDJR located at 112 Route 908, Natrona Heights, PA 15065, for a total price of $61,703.

185.   Plaintiff Figley made the decision to lease his Class Vehicle after considering FCA's representations about the Class Vehicle, including the reported 21-mile electric range. Plaintiff Figley chose the Class Vehicle based primarily on its represented range, and also based on FCA's reputation for manufacturing quality vehicles. Plaintiff Figley anticipated his commute to be driven entirely on electric power alone, since he would be driving about 1.5 miles each way. He

likewise anticipated daily driving for other purposes to be handled entirely by the electric power alone.

186.   Prior to his purchase, neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Figley of the Defect. Plaintiff Figley reasonably expected that the Class Vehicle would function normally as a plug-in hybrid vehicle and in accordance with Defendant's specifications and representations.

187.   Plaintiff Figley purchased the Class Vehicle for personal use. Plaintiff Figley has always attempted to use the Class Vehicle in the normal and expected manner.

188.   Almost since the time of purchase, Plaintiff Figley has been in and out of FORM. Cumulatively, Plaintiff Figley's vehicle has been in FORM for over 900 miles. The Defect appears more prevalent when the temperature falls below 25 degrees Fahrenheit. Plaintiff Figley estimates that in a two-hundred-mile span, he has only been able to drive twenty miles in electric-only mode. Plaintiff Figley has not visited a dealership for this issue because of the reported issues other Class Vehicle owners have described, mainly due to them being told that the Class Vehicle is operating as designed.

189.   The inability of Plaintiff Figley's vehicle to use electric power presents safety issues. Plaintiff has noticed that, when the Defect manifests and the

electric propulsion system is unavailable, the Class Vehicle's acceleration is greatly diminished. This performance shortcoming makes merging and highway driving dangerous.

190.   Due to Defendant's concealment, fraud and/or omissions, and refusal to correct the Defect, Plaintiff Figley did not receive the benefit of his bargain. Had Plaintiff Figley known that the vehicle's electric-only or electric-assisted range was frequently unavailable on demand, as advertised, even when the battery was charged, Plaintiff Figley would not have purchased the Class Vehicle or would have paid less for it.

## CLASS ACTION ALLEGATIONS

191.   Plaintiffs bring this action as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of a proposed nationwide class (the "Nationwide Class"), defined as:

> Any person in the United States who purchased or leased, other than for resale, a Class Vehicle.

192.   In addition, the proposed state subclasses (the "State Subclasses") are defined as follows:

> **Georgia Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Georgia.

> **Iowa Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Iowa.

69

**Maryland Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Maryland.

**Michigan Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Michigan.

**Minnesota Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Minnesota.

**Montana Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Montana.

**New York Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of New York.

**Ohio Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Ohio.

**Pennsylvania Subclass:** All persons who bought or leased, other than for resale, a Class Vehicle in the state of Pennsylvania.

193.   The Class and these Subclasses satisfy the prerequisites of Federal Rule of Civil Procedure 23(a) and the requirements of Rule 23(b)(3).

194.   **Numerosity and Ascertainability:** Plaintiffs do not know the exact size of the Class or identity of the Class Members, since such information is the exclusive control of Defendant. Nevertheless, the Class encompasses thousands of individuals dispersed throughout the United States. The number of Class Members is so numerous that joinder of all Class Members is impracticable. The names, address, and phone numbers of Class Members are identifiable through documents maintained by FCA.

195.   **Commonality and Predominance:** This action involved common questions of law and fact which predominate over any questions solely affecting individual Class Members. These common questions include:

i.      Whether Defendant engaged in the conduct alleged herein;

ii.     Whether Defendant had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iii.    Whether Defendant should have had knowledge of the Defect in the Class Vehicles when they placed Class Vehicles into the stream of commerce in the United States;

iv.     When Defendant became aware of the Defect in the Class Vehicles

v.      Whether Defendant knowingly failed to disclose the existence and cause of the Defect in the Class Vehicles;

vi.     Whether Defendant knowingly concealed the Defect in the Class Vehicles;

vii.    Whether Defendant's conduct as alleged herein violates consumer protection laws;

viii.   Whether Defendant's conduct as alleged herein violates warranty laws;

71

    ix.     Whether Defendant's conduct as alleged herein violates other laws asserted herein;

    x.     Whether Plaintiffs and Class Members overpaid for their Class Vehicles as a result of the Defect; and

    xi.     Whether Plaintiffs and Class Members are entitled to damages and equitable relief.

196.  **Typicality:** Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were comparably injured through Defendant's substantially uniform misconduct as described above. The Plaintiffs representing the Class are advancing the same claims and legal theories on behalf of himself and all other members of the Class that they represent, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and Class Members arise from the same operative facts and are based on the same legal theories.

197.  **Adequacy:** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

198.   **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be virtually impossible for the Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not; individualized litigation creates a potential for inconsistent or contradictory judgments, increased the delay and expense to the parties, and increases the expense and burden to the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by this Court.

## CLAIMS FOR RELIEF

### COUNT I
### Common Law Fraud by Omission
### (Brought on Behalf of the Nationwide Class and alternatively on behalf of the State Subclasses)

199.   Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

200.   Plaintiffs assert this theory of fraud by omission on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant.

201.   Defendant committed fraud by failing to disclose and actively concealing, at the point of sale and otherwise, the Defect.

202.   Defendant was under a duty to Plaintiffs and the Class Members to disclose the Defect because:

> a.   Defendant was in a superior position to know about the existence, nature, cause, and results of the Defect;
>
> b.   Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Defect; and
>
> c.   Defendant knew that Plaintiffs and Class Members could not reasonably have been expected to learn about or discover the Defect.
>
> d.   Defendant made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

203.   The Defect and the facts concealed by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lower price.

204.   Defendant concealed or did not disclose the Defect in order to induce Plaintiffs and the Class Members to purchase the Class Vehicles at a substantially higher price than they otherwise would have paid.

205.   Defendant's omissions were accompanied by the above-discussed affirmative representations that the Class Vehicles could be reliably operated using electric power only.

206.   Plaintiffs and Class Members would not have purchased the Class Vehicles if they knew of the Defect, or they would have only paid substantially less.

207.   Plaintiffs and the Class Members relied on Defendant's failure to disclose the Defect – in purchasing or leasing the Class Vehicles. As a result of their reliance, Plaintiffs and the other Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Class Vehicles. Meanwhile, Defendant has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

208.   As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and all members of the Class have been damaged in an amount to be proven at trial.

209.   Defendant's acts and/or omissions were done wantonly, maliciously, oppressively, deliberately, with intent to defraud; in reckless disregard of the rights of Plaintiffs and the Class; and to enrich itself. Defendant's misconduct warrants an assessment of punitive damages in an amount sufficient to punish FAC and deter such conduct in the future, which amount shall be determined according to proof at trial.

**COUNT II**
**Common Law Fraud – Affirmative Misrepresentation**
**(Brought on Behalf of the Nationwide Class and alternatively on behalf of the State Subclasses)**

210.   Plaintiffs and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

211.   Plaintiffs asserts this affirmative misrepresentation theory of fraud on behalf of themselves and the Nationwide Class or, in the alternative, on behalf of the State Subclasses, against Defendant.

212.   Defendant presented the Class Vehicles as plug-in hybrid SUVs capable of running on either gasoline or electricity, depending on the election of the user.

213.   Defendant actively mispresented the attributes and capabilities of the Class Vehicles by claiming that the vehicles had been thoroughly tested and featured electric-only drive abilities on par with gasoline-powered driving.

214.   Indeed, in its advertisements, FCA claimed that the Jeep Wrangler 4xe had an electric range of 21 miles, supporting its claim that it would meet Consumers' need for a Vehicle that provides "nearly silent, zero-emission, electric-only propulsion." FCA communicated through these advertisements that the Class Vehicles were safe, dependable, and would offer the electric range advertised.

215.   FCA further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car, that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the battery was fully charged.

216.   FCA knew that these representations were false when made.

217.   Defendant also claimed that the Class Vehicles were capable of providing reliable transportation and even promised that they could provide electric powered transportation on a daily basis.[47]

218.   But the Class Vehicles purchased or leased by Plaintiffs and Class Members were, in fact, defective and unreliable because the Class Vehicle's batteries are susceptible to frequent and prolonged deactivation when the Class Vehicle detected stale fuel or ran the gas engine to lubricate it.

---

[47] 2022 Jeep® Wrangler 4xe - Hybrid Electric 4x4 SUV (accessed 10/18/2022) ("[w]ith the ability to charge at home and work, you can enjoy the benefits of fully electric daily commutes")

219.   Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

220.   FCA has known since at least the first model year that its representations regarding the Class Vehicles' range and usability were false. Even now, FCA advertises the Wrangler 4xe to have a driving range of at least 21 miles. FCA broadcasts these advertisements with the intent that members of the general public rely on FCA's representations in making their purchases.

221.   A reasonable consumer would have done just that, expecting that they would in fact be able to run the "plug-in hybrid" Class Vehicles on electric power only at will.

222.   Plaintiffs and Class Members relied on FCA's affirmative misrepresentations regarding the range and usability of the Class Vehicles when deciding to purchase or lease the Class Vehicles. Had they known the true nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiffs and Class Members were therefore fraudulently induced to purchase or lease the Class Vehicles with the defects alleged herein, and the resulting harms.

223.   To the extent that FCA's conduct was willful, oppressive, or malicious, Plaintiffs and Class Members are entitled to an award of punitive damages.

## COUNT III
## Equitable Injunctive and Declaratory Relief
### (On Behalf of the Maryland Subclass against FCA)

224.   Plaintiff Crowell and the Maryland Subclass incorporate by reference each preceding paragraph as though fully set forth at length herein.

225.   FCA is under a continuing duty to inform its customers of the conditions under which electric-only or electric-assisted driving will be unavailable. Despite this, FCA has failed to inform customers of the key conditions necessary to enable electric-only or electric-assisted driving in Class Vehicles currently sold to consumers.

226.   Plaintiff Crowell, members of the Maryland Subclass, and the public will suffer irreparable harm if FCA is not ordered to offer rescission to the Maryland Subclass by repurchasing their Class Vehicles for their full cost, and to cease and desist from marketing, advertising, selling, and leasing the Class Vehicles.

227.   Such irreparable harm includes but is not limited to likely injuries as a result of the defects to the Class Vehicles. Plaintiff Crowell and members of the Maryland Subclass sustained injuries, including but not limited to, paying more for

79

Class Vehicles than they otherwise would have, receiving a vehicle worth less than the one they bargained and paid for, paying for diagnoses, repairs, replacements, paying more for fuel than they otherwise would have, and are left with Class Vehicles of diminished value and utility.

### COUNT IV
### Violation of the Maryland Consumer Protection Act ("MCPA")
### Md. Code Ann., Commercial Law § 13-101, *et seq*.
### (On Behalf of the Maryland Subclass)

228.   Plaintiff Crowell and the Subclass incorporate by reference each preceding paragraph as though fully set forth at length herein.

229.   Plaintiff Crowell brings this claim individually and on behalf of the Maryland Subclass.

230.   Plaintiff Crowell and Maryland Subclass members who purchased Class Vehicles containing the Defect are "consumers" under MCPA.

231.   The Class Vehicles are consumer goods within the meaning of the MCPA.

232.   The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

233.   Defendant violated the MCPA by, *inter alia*, engaging in the following unfair, deceptive acts or practices:

    A. Failing to disclose material facts that deceived and had the tendency to deceive; and

B. Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with the promotion or sale of consumer goods or services.

234.   Defendant violated the MCPA by concealing, suppressing or omitting material facts regarding the Defect and the Class Vehicles, including, but not limited to, the fact that the hybrid system does not perform as advertised, rendering the Class Vehicles unsuitable for electric-only or electric-assisted driving. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase or how much to pay for, for the compromised hybrid system and the Class Vehicles.

235.   Therefore, Defendant concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff Crowell and the Maryland Subclass would rely on the omissions in the purchase of their Class Vehicles.

236.   To this day, Defendant continues to violate the MCPA by actively concealing the material information about the Class Vehicles and the Defect and by representing to Plaintiff Crowell and members of the Maryland Subclass that the Class Vehicles and the compromised hybrid system performs better than it in fact does and is suitable for certain uses for which it is not suited. Upon

information and belief, Defendant has utilized the same fraudulent marketing strategy with regard to all of the Class Vehicle model years.

237.   Defendant intended that Plaintiff Crowell and the Maryland Subclass members rely on its concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

238.   Defendant's practices, acts, policies and course of conduct violated MCPA's prohibition on unfair and deceptive conduct in that:

A. At the time of sale, Defendant knowingly and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff Crowell and Maryland Subclass members material information, namely the Defect and its impact on the performance of the Class Vehicles.

B. Thereafter, Defendant failed to disclose these facts to Plaintiff Crowell and the Maryland Subclass members, through warnings or other notices, and/or actively concealed the Defect from them, even though Defendant knew of the issue at the time of manufacture because FCA designed and/or programmed the hybrid system to deactivate when FORM activated.

C. Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the Class Vehicles would include the Defect and that the Class Vehicles would perform substantially worse than advertised and be unsuitable for some uses.

D. Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles and compromised hybrid system to the consuming public and to represent that they were in good working order, merchantable, and performed as advertised, despite Defendant's knowledge that they would not perform as intended, represented, and warranted. Specifically, beginning in September 2020,

FCA made the above-discussed misleading representations to consumers on press releases regarding the attributes of the hybrid system, while omitting the Defect. In advertising and selling the Class Vehicles, which began in April 2020, FCA failed to disclose the reduced performance of the compromised hybrid system as well as FCA's inclusion of the compromised hybrid system in the Class Vehicles. FCA further exacerbated its misinformation by means of the above-discussed misleading Class Vehicle performance claims on FCA's website.

E. Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

239.   Defendant's acts and/or omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers. Defendant has, through knowing, intentional, material omissions, concealed the true inferior nature of the Class Vehicles, and compromised hybrid system.

240.   Defendant's acts and/or omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that could not have been reasonably avoided by consumers.

241.   As a direct and proximate result of these unfair acts or practices, Plaintiff Crowell and Maryland Subclass members have been damaged because they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would have, received a vehicle worth less than the one they bargained and paid for, paid for diagnoses, repairs, and replacements,

paid for fuel they otherwise would not have, and are left with Class Vehicles of diminished value and utility. Meanwhile, FCA has sold more Class Vehicles than it otherwise could have, and FCA has charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

242.   Plaintiff Crowell and members of the Maryland Subclass also seek appropriate equitable relief, including an order requiring Defendant to adequately disclose and remediate the issue by offering purchasers of the Class Vehicles rescission and a full refund, and an order enjoining Defendant from engaging in misleading marketing with respect to the Defect in the future.

**COUNT V**
**Violation of the Michigan Consumer Protection Act ("MCPA")**
**Michigan Comp. Laws Ann., § 445.903 *et seq*.**
**(On Behalf of the Michigan Class)**

243.   Plaintiff Heeter and the Subclass incorporate by reference each preceding paragraph as though fully set forth at length herein.

244.   Plaintiff Heeter brings this claim individually and on behalf of the Michigan Subclass.

245.   Plaintiff and Class Members who purchased or leased Class Vehicles are "consumers" under the MCPA.

246.   The Class Vehicles are consumer goods within the meaning of the MCPA and provides services within the MCPA's meaning of the term consumer services.

84

247.   The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

248.   Defendant violated the MCPA by, among other things, engaging in the following unfair deceptive acts or practices:

      a.   Failing to disclose material facts that deceived and had the tendency to deceive; and

      b.   Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with: (i) the promotion or sale of consumer goods or services; or (ii) the subsequent performance of a merchant with respect to an agreement of sale or lease.

249.   Defendant violated the MCPA by concealing, suppressing or omitting material facts regarding the Vehicles, including, but not limited to, the fact that the hybrid system does not perform as advertised, rendering the Class Vehicles unsuitable for electric-only or electric-assisted driving. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase or lease, or how much to pay, for the compromised hybrid system and the Class Vehicles.

250.   Defendant concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff and the Michigan Subclass would rely on the omissions in the purchase or lease of their Class Vehicles.

251.   To this day, Defendant continues to violate the MCPA by actively concealing the material information about the Vehicles and their defective hybrid system and by representing to Plaintiff Heeter and members of the Michigan Subclass that the Class Vehicles are defect-free and safe.

252.   Defendant intended that Plaintiff Heeter and the Michigan Subclass members would rely on its concealment and omissions of material facts, which occurred in the course of conduct involving trade and commerce.

253.   Defendant's practices, acts, policies and course of conduct violated MCPA's prohibition on unfair and deceptive conduct in that:

    a.   At the time of sale, Defendant knowingly and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff and Class Members the defective hybrid system and the Defect.

    b.   Thereafter, Defendant failed to disclose the Defect to Plaintiff and the Class Members, either through warning or recall notices, and/or actively concealed from them that the Class Vehicles'

86

hybrid system was defective, even though Defendant knew of such defect: (1) at the time of manufacture, when it created the hybrid system in a manner unable to provide for consistent electric-only or electric-assisted power operation; (2) from complaints to NHTSA and web forums actively monitored by Defendant; (3) when, on information and belief, Defendant's internal analyses determined the ubiquity of the problem upon learning from dealer records of customer complaints.

c. Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the hybrid system on the Class Vehicles would be compromised and that the Class Vehicles would have the Defect.

d. Nonetheless, Defendant forced Plaintiff Heeter and Class Members to expend money at dealerships on diagnosis and ineffectual repairs and part replacements on the Class Vehicles, despite Defendant's prior knowledge of the Defect.

e. Defendant, in administering its limited warranty, engaged in materially misleading deceptive acts and practices by classifying the Defect as part of the Class Vehicles' normal operation, so as to ignore customer complaints about the Defect. When Defendant did

work on the Class Vehicles, it provided ineffectual service that failed to remedy the Defect.

254.   Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles to the consuming public and to represent that the Class Vehicles were in good working order, merchantable, and not defective, despite Defendant's knowledge that the Class Vehicles would not perform as intended, represented, and warranted and that the above described Defect would cause purchasers to incur significant out-of-pocket costs and expenses.

255.   Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

256.   Defendant's acts and/or omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers. Defendant has, through knowing, intentional, material omissions, concealed the true defective nature of the Class Vehicles.

257.   Defendant's acts and/or omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are

injuries of a nature that they could not have been reasonably avoided by consumers.

258.   As a direct and proximate result of these unfair acts or practices, Plaintiffs and Class Members have been damaged because: they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would have, paid for diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the Defect. Meanwhile, Defendant has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

259.   Plaintiffs and Class Members seek restitution of the substantial sums of money they expended to diagnose and repair the Defect in their Class Vehicles, which Defendant knew about prior to their sale.

260.   Plaintiffs and Class Members also seek appropriate equitable relief, including an order requiring defendant to adequately disclose and remediate the Defect and an order enjoining Defendant from incorporating the defective hybrid system into its vehicles in the future.

**COUNT V**
**Common Law Breach of Implied Warranty**
**(On Behalf of the Nationwide Class)**

261.   Plaintiffs hereby adopt and incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

262.   Defendant is a merchant and was at all relevant times involved in the manufacturing, warranting, and distributing for resale to consumers. Defendant knew or had reason to know of the specific use for which the Class Vehicles, as goods, are purchased.

263.   Defendant entered into agreements with retailers and suppliers to sell its Class Vehicles to Class Members.

264.   Defendant provided Plaintiffs and Class Members with implied warranties that the Class Vehicles, as hybrid SUVs, are merchantable and fit for the particular purposes for which they are used and sold.

265.   However, the Class Vehicles are not fit for their particular purpose of providing reasonably reliable transportation by the user's choice of electric-powered or gasoline powered movement. In fact, the electric-only or electric-assisted driving capacity is frequently unavailable. Therefore, the Class Vehicles are not fit for their particular purpose as a hybrid SUV.

266.   Similarly, a hybrid vehicle that does not grant the driver access to both power sources is not merchantable.

267.   Privity is not required because Plaintiffs and Class Members are the intended beneficiaries of Defendant's warranties and their sale through authorized

90

retailers. Defendant's retailers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer only and Plaintiffs and Class Members were the intended beneficiaries.

268.   More specifically, Defendant's intention that its warranties apply to Plaintiffs and Class Members as third-party beneficiaries is evident from the statements contained in its product literature, including its warranty. Likewise, it was reasonably foreseeable that Plaintiffs and consumer Class Members would be the intended beneficiaries of the Class Vehicles and warranties.

269.   Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. These implied warranties included, among other things: (i) a warranty that the Class Vehicles manufactured, supplied, and distributed for sale by Defendant was reliable for electric-only or electric-assisted operation as plugin hybrid SUVs; and (ii) a warranty that the Class Vehicles would be fit for its intended use while it was being operated.

270.   Contrary to the applicable implied warranties, the Class Vehicles, at the time of sale and thereafter, were not fit for the ordinary and intended purpose of providing Plaintiffs and Class Members with providing reliable electric powered transportation on a daily basis.  Instead, the Class Vehicles suffers from a defective design and/or manufacture, as alleged herein.

91

271.   Defendant's sale of defective vehicles and failure to provide a refund caused the implied warranty to fail in its essential purpose.

272.   Defendant breached the implied warranties because the Class Vehicles were sold with the Defect, which substantially reduced and/or prevented them from being used as hybrid vehicles.

273.   Defendant was put on constructive notice about its breach through its review of consumer complaints and upon information and belief, through product testing and communications from dealerships. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

274.   As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT VI**
**Magnuson-Moss Warranty Act**
**(On Behalf of the Nationwide Class)**

275.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

276.   Plaintiff and Nationwide Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

277.   Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

278.   The Class Vehicle is a "consumer product[]" as defined in 15 U.S.C. § 2301(1).

279.   Defendant extended an implied warranty to Plaintiffs and Nationwide Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers the Defect in its Class Vehicles.

280.   Defendant breached this implied warranty by selling a defective product that was neither merchantable nor fit for its intended purpose.

281.   Defendant is under a continuing duty to inform its customers of the nature and existence of potential defects in the vehicles sold.

282.   Defendant breached its express warranties by offering for sale and selling vehicles that were by design and construction defective, thereby subjecting the purchasers or lessors of the Class Vehicles to damages.

283.   Defendant also breached its express warranties by failing to provide an adequate and lasting remedy to cure the Defect within a reasonable time, thereby subjecting the purchasers or lessors of the Class Vehicles to damages. Indeed, while Defendant has suggested that the Defect can be mitigated through

93

the purchase of additional parts, it is only offering to sell said parts to consumers—rather than provide the parts for free as would be appropriate.

284.   As a direct and proximate result of Defendant's breach of the express and implied warranties under the Magnuson-Moss Act, Plaintiffs, and the Nationwide Class, have been damaged in an amount to be proven at trial.

## COUNT VII
## Breach of Express Warranty
### (Asserted on behalf of the Nationwide Class and alternatively on behalf of the State Subclasses)

285.   Plaintiffs and the Nationwide Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

286.   Defendant's Owner Manual was provided with every Class Vehicle and contained affirmations of fact or promise made by the Defendant to Class Members relating to performance of the Class Vehicles which became part of the basis of the bargain and thus an express warranty that the Class Vehicles shall conform to the affirmation. Moreover, the description of the Class Vehicles in the Owner Manual was made part of the basis of the bargain and created an express warranty that the Class Vehicles shall conform to the description.

287.   Specifically, the Owner Manual provides that: "[T]he engine may run for a period of up to 20 minutes when fully warm whenever the vehicle is operational (no electric only operation). If the vehicle is shut down before

conditions to exit the refresh mode have been satisfied, the engine may run for additional time on subsequent trips."[48]

288.   The Class Vehicles do not perform in manner as admitted to by Defendant in the Owner Manual for the 2022 MY.

289.   Further, in its advertisements, FCA claimed that the Class Vehicles had an electric range of 21 miles, supporting its claim that it would meet consumers' need for a vehicle that provides "nearly silent, zero-emission, electric-only propulsion." FCA communicated through these advertisements that the Class Vehicles were safe, dependable, and would offer the electric range advertised, including specifically in cold snowy weather.

290.   FCA further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication that the Class Vehicles it was selling had no significant defects and would perform and operate properly, including when the battery was fully charged. FCA knew that these representations were false when made.

---

[48] *Id.*

291.   Defendant also expressly warranted that the Class Vehicles were capable of providing reliable transportation and even promised that they could provide electric powered transportation on a daily basis.[49]

292.   Defendant also expressly warranted that it would repair and/or replace defects in material and/or workmanship free of charge that occurred during the Limited Warranty.

293.   Defendant breached these warranties by selling to Plaintiffs and Class Members Class Vehicles with known problems, which lack the ability to provide electric-powered transportation on a regular basis.

294.   As described above, Defendant also breached the warranties in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

295.   As a result of the Defendant's actions, Plaintiffs and Class Members have suffered economic damages including but not limited to costly repairs, loss of vehicle use, substantial loss in value and resale value of the Class Vehicles, and other related damage.

296.   Defendant's attempt to disclaim or limit its express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.

---

[49] 2022 Jeep® Wrangler 4xe - Hybrid Electric 4x4 SUV (accessed 10/18/2022) ("[w]ith the ability to charge at home and work, you can enjoy the benefits of fully electric daily commutes")

Specifically, Defendant's warranty limitations are unenforceable because FCA knowingly sold a defective product without informing consumers about the manufacturing and/or material defect.

297.   Furthermore, Defendant continues to charge Class Members for parts used to mitigate the Defect and has failed to repair the defective Class Vehicles.

298.   The time limits contained in Defendant's warranty periods were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between FCA and Class Members, and FCA knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

299.   In addition, FCA's warranty fails of its essential purpose because FCA has been and is unable to effectively repair the Defect. As discussed above, Defendant's response of telling drivers to simply wait until the weather warms is wholly inadequate.

300.   Plaintiffs and Class Members have complied with all obligations under the warranties, or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

97

## COUNT VIII
## Unjust Enrichment/Restitution
### (Asserted on behalf of the Nationwide Class / Asserted in the Alternative on behalf of the State Subclasses)

301.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

302.   Defendant has been unjustly enriched as a result of the conduct described in this Complaint.

303.   Defendant received a benefit from Plaintiffs and the members of the Nationwide Class and State Subclasses in the form of payment for the Class Vehicles.

304.   Retention of these benefits by Defendant would be unjust and inequitable because Defendant received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

305.   The benefits (or at least some portion the benefits) that Defendant received were not legitimately earned and came at the expense of Plaintiffs and the other members of the Nationwide Class and State Subclasses.

306.   Defendant knows that the Class Vehicles do not operate as promised or as a reasonable consumer would expect of a hybrid vehicle, but nonetheless continues to sell them without warning. To make matters worse, Defendant actively lauded and emphasized the performance of the Class Vehicles' electric-

only operation despite knowing that the Defect would render such operation frequently inaccessible for extended periods of time.

307.   Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

308.   Defendant's conduct is unjust, inequitable, and wrongful, but systematically engages in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits, including the substantial premium that consumers pay for vehicles with electric-only or electric-assisted  driving capabilities.

309.   There is no justification for Defendant's continued silence and/or affirmative misrepresentations, as customers purchased the defective Class Vehicles.

310.   It is therefore against equity and good conscience to permit Defendant to retain the proceeds from its sales of the defective Class Vehicles.

311.   Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

**COUNT IX**
**Violations of the New York General Business Law**
**(New York Gen. Bus. Law § 349, et. seq.)**
**(Asserted on Behalf of the New York Subclass)**

312.   Plaintiffs Saka and Gelber bring this claim on behalf of themselves and the New York Subclass.

313.   Defendant conducts "business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 349(a).

314.   Plaintiffs Saka, Gelber and members of the New York Subclass are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h).

315.   Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful. N.Y. Gen. Bus. Law § 349.

316.   In the course of FCA's business, FCA intentionally or negligently concealed and suppressed material facts concerning the Defect including, but not limited to, the fact that electric-only or electric-assisted operation of the Class Vehicles is frequently unavailable and that the Class Vehicles' gas-powered performance falls below both the advertised acceleration capacity in the absence of support from the Class Vehicle's electric propulsion system.

317.   Defendant thus violated N.Y. Gen. Bus. Law § 349, at a minimum by: (1) causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles; (2) representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have; (3)

100

representing that the Class Vehicles are of a particular standard, quality, and grade when they are not; (4) advertising the Class Vehicles with the intent not to sell or lease them as advertised; (5) engaging in other conduct which created a likelihood of confusion or of misunderstanding; and (6) using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived, or damaged thereby.

318.   FCA intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiffs and the New York Subclass.

319.   Defendant's deceptive acts or practices were materially misleading. Defendant's conduct was likely to and did deceive reasonable consumers, including Plaintiffs and members of the New York Subclass, about the Class Vehicles' true performance and value.

320.   FCA knew or should have known that its conduct violated N.Y. Gen. Bus. Law § 349.

321.   Defendant owed Plaintiffs and New York Subclass members a duty to disclose, truthfully, all the facts concerning the capacity of the Class Vehicles

101

because it: (1) possessed knowledge of the Defect from several sources, including customer complaints, information sent from dealers, and its own internal records, including pre-sale durability testing; (2) intentionally concealed  the Defect from consumers; and (3) made incomplete representations about the Class Vehicles generally, including in the Lass Vehicle warranty books, while purposefully withholding material facts from Plaintiffs and the New York Subclass.

322.   Plaintiffs and members of the New York Subclass were unaware of, and lacked a reasonable means of discovering, the material facts Defendant omitted.

323.   Plaintiffs and the New York Subclass Members paid a substantial premium for the Class Vehicles due to the Class Vehicles' purported ability to operate on electric-only or electric-assisted propulsion.

324.   Plaintiffs and New York Subclass members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's misrepresentations and/or its concealment of and failure to disclose material information.  Plaintiffs and the New York Subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Class Vehicles' true nature had been disclosed—would have paid significantly less for them.

325.   Plaintiffs and Subclass Members also paid for diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the Defect.

326.   Defendant's misleading conduct concerns the reliability of widely purchased consumer products and affects the public interest.

327.   Defendant's unlawful acts and practices complained of herein are likely to be repeated.

328.   As a direct and proximate result of FCA's actions described above, Plaintiffs and the New York Subclass members have been injured in fact and suffered damages, and seek relief in the form of actual damages, punitive damages, reasonable attorneys' fees, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT X
## Violation of the Minnesota Prevention of Consumer Fraud Act ("MPCFA")
## Minn. Stat. § 325F.68-70
## (On Behalf of the Minnesota Subclass)

329.   Plaintiff Forst and the Class incorporate by reference each preceding paragraph as though fully set forth at length herein.

330.   Plaintiff Forst brings this claim individually and on behalf of the Minnesota Subclass.

103

331.    Plaintiff Forst and Minnesota Subclass members who purchased Class Vehicles containing the Defect are "persons" as defined by the MPCFA, Minn. Stat. § 325F.68(2). The Class Vehicles sold to Plaintiff Forst and the Minnesota Subclass are "merchandise" as defined by Minn. Stat. § 325F.68(2).

332.    The MPCFA makes unlawful "[t]he act, use, or employment by an person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69(1). The MPCFA further provides that "any person injured by a violation of [the MPCFA] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31(3a).

333.    Defendant engaged in unlawful conduct in violation of the MPCFA by making knowing and intentional omissions. Defendant knowingly failed to disclose the manufacturing and/or material the Defect in the Class Vehicles in order to secure the sale of the Vehicles, and to offer them at a premium price.

334.    Therefore, Defendant concealed, suppressed or omitted these material facts in conducing trade and commerce with the intent that Plaintiff Forst and the

Minnesota Subclass would rely on the omissions in the purchase of the Class Vehicles.

335.   Defendant did not fully and truthfully disclose to its customers the true nature of the Defect, which was not readily discoverable until after the Class Vehicles were purchased. As a result, Plaintiff Forst and the other Minnesota Subclass members were fraudulently induced to purchase the Class Vehicles with the Defect and all of the resultant actual and potential problems. These facts that Defendant concealed were solely within its possession.

336.   Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

337.   Defendant intended that Plaintiff Forst and all Minnesota Subclass members rely on the acts of concealment and omissions, so that they would purchase the Class Vehicles.

338.   Plaintiff Forst and the Minnesota Subclass actually relied on Defendant's misrepresentations and/or omissions alleged herein and caused Plaintiff Forst and the Minnesota Subclass to purchase Class Vehicles. Defendant's conduct caused Plaintiff Forst and Minnesota Subclass members to suffer an ascertainable loss. If Plaintiff Forst and the Minnesota Subclass knew about the Defect, they would not have purchased the Class Vehicles—or would have paid for

less for them. Plaintiffs and Subclass Members also paid for diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the Defect.

339.   In addition to direct monetary losses, Plaintiff Forst and Minnesota Subclass members have suffered an ascertainable loss by receiving less than what was promised and paid for.

340.   A causal relationship exists between Defendant's unlawful conduct and the ascertainable losses suffered by Plaintiff Forst and the Minnesota Subclass. Had the Defect in the Class Vehicles been disclosed, consumers would not have purchased them or would have paid less for the Class Vehicles had they decided to purchase them.

341.   Plaintiff Forst and the Minnesota Subclass did not receive the benefit of their bargain as a result of Defendant's conduct.

342.   Defendant's unlawful acts and practices complained of herein affect the public interest. As a direct and proximate result of Defendant's violations of the MPCFA, Plaintiff Forst and the Minnesota Subclass have suffered injury-in-fact and/or actual damage. Pursuant to Minn. Stat. § 8.31 subd. 3a, Plaintiff Forst and the Minnesota Subclass seek actual damages, attorneys' fees, and any other just and proper relief as provided under the MPCFA.

## COUNT XI
## Violation of the Private Right of Action for the Consumer Frauds Act, Iowa Code Chapter 714H
## (On Behalf of the Iowa Subclass)

343.   Plaintiff Nau incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

344.   Plaintiff Nau brings this claim individually and on behalf of the Iowa Subclass.

345.   Defendant is a "person" within the meaning of Iowa Code § 714.16(j).

346.   The Class Vehicles are "merchandise" within the meaning of Iowa Code § 714.16(i).

347.   There was a sale of merchandise from Defendant to Plaintiff Nau and members of the Iowa Subclass.

348.   Defendant's deceptive representations and material omissions to Plaintiff Nau and the Iowa Subclass constitute unfair and deceptive acts and practices under Iowa law.

349.   Pursuant to Iowa law, Defendant has a statutory duty to refrain from unfair or deceptive acts or practices in the manufacture, promotion, and sale of the Class Vehicles to Plaintiff Nau and the Iowa Subclass.

350.   Defendant violated this statutory prohibition against engaging in unlawful acts and practices by, *inter alia*, misrepresenting and/or omitting material facts with the "intent that others rely upon the unfair practice, deception, fraud,

107

false pretense, false promise, misrepresentation, concealment, suppression, or omission" in connection with the sale of the Class Vehicles. Iowa Code § 714H.3.

351.   In connection with the sale to consumers of the Class Vehicles, Defendant engaged in unfair and deceptive acts and practices, as alleged in this Petition by unfairly and deceptively misrepresenting the Class Vehicles including but not limited to, by omitting the fact that the hybrid system does not perform as advertised rendering the Class Vehicles unsuitable for electric-only or electric-assisted driving.

352.   Defendant had exclusive knowledge of the material facts that the Class Vehicles had the Defect and failed to disclose such information to Plaintiff Nau and the Iowa Subclass.

353.   The facts concealed or not disclosed by Defendant to Plaintiff Nau and the Subclass are material in that a reasonable consumer would have considered them to be important when deciding whether to purchase the Class Vehicles.

354.   Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

355.   Defendant intended for Plaintiff Nau and the Subclass to rely on its misrepresentations, deceptions, and/or omissions regarding the Class Vehicles

356.   Plaintiff Nau and the Subclass were actually deceived by Defendant's misrepresentations, deceptions, and/or omissions regarding the Class Vehicle

357.   Plaintiff and the Subclass members were unaware, and did not have reasonable means of discovering the material facts that Defendant had misrepresented and/or failed to disclose.

358.   As a direct and proximate result of the unfair and deceptive conduct of the Defendant, Plaintiff Nau and the Subclass sustained damages when they purchased the Class Vehicles that are worth less than the price paid and that they would not have purchased at all—or would have paid for less for them—had they known of the presence of the Defect.

359.   Plaintiffs and Subclass Members also paid for diagnoses, repairs, and replacements, towing, and/or rental cars, and are left with Class Vehicles of diminished value and utility because of the Defect.

360.   Substantial benefits have been conferred on Defendant by Plaintiff Nau and the Subclass through the purchase of the Class Vehicles. Defendant knowingly and willingly accepted and enjoyed these benefits.

361.   Pursuant to Iowa Code § 714H.5, Plaintiff Nau and the Subclass seek actual damages, equitable relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the Iowa Consumer Frauds Act.

**COUNT XII**
**Violation of the Montana Unfair Trade Practices and Consumer
Protection Act ("MTCPA") Mont. Code § 30-14-101, et seq.
(On Behalf of the Montana Subclass)**

362.   Plaintiff Gittings and the Class incorporate by reference each
preceding paragraph as though fully set forth at length herein.

363.   Plaintiff Gittings brings this claim individually and on behalf of the
Montana Subclass, in federal court.

364.   Plaintiff Gittings and Montana Subclass members who purchased
Class Vehicles are "consumers." Mont. Code § 30-14-102(1).

365.   Defendant is a "person." Mont. Code § 30-14-102 (6).

366.   The MTCPA prohibits "[u]nfair methods of competition and unfair or
deceptive acts or practices in the conduct of any trade or commerce." Mont. Code
§ 30-14-103.

367.   Defendant violated the MTCPA by, inter alia, engaging in the
following unfair, deceptive acts or practices by failing to disclose material facts
that deceived and had the tendency to deceive; and Engaging in deception, fraud,
false pretense, false premise, misrepresentation, or knowing concealment,
suppression, or omission of any material fact with the intent that a consumer rely
on the same in connection with the promotion or sale of consumer goods or
services.

368.    Therefore, Defendant concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff Gittings and the Montana Subclass would rely on the omissions in the purchase of their Class Vehicles.

369.    Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

370.    To this day, Defendant continues to violate the MTCPA by actively concealing material information about the Class Vehicles and the Defect and by representing to Plaintiff Gittings and members of the Montana Subclass that the Class Vehicles and the compromised hybrid system performs better than it in fact does and is suitable for certain uses for which it is not suited.

371.    Defendant intended that Plaintiff Gittings and the Montana Subclass members rely on its concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

372.    Defendant's practices, acts, policies and course of conduct violated MCPA's prohibition on unfair and deceptive conduct in that:

A. At the time of sale, Defendant knowingly and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff Gittings and Subclass members material information, namely the Defect and its impact on the performance of the Class Vehicles.

111

B. Thereafter, Defendant failed to disclose these facts to Plaintiff Gittings and the Subclass members, through warnings or other notices, and/or actively concealed the Defect from them, even though Defendant knew of the issue at the time of manufacture because FCA designed and/or programmed the hybrid system to deactivate when FORM activated.

C. Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the Class Vehicles would include the Defect and that the Class Vehicles would perform substantially worse than advertised and be unsuitable for some uses.

D. Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles and compromised hybrid system to the consuming public and to represent that they were in good working order, merchantable, and performed as advertised, despite Defendant's knowledge that they would not perform as intended, represented, and warranted. Specifically, beginning in September 2020, FCA made the above-discussed misleading representations to consumers on press releases regarding the attributes of the hybrid system, while omitting the Defect. In advertising and selling the Class Vehicles, which began in April 2020, FCA failed to disclose the reduced performance of the compromised hybrid system as well as FCA's inclusion of the compromised hybrid system in the Class Vehicles. FCA further exacerbated its misinformation by means of the above- discussed misleading Class Vehicle performance claims on FCA's website.

373.   Defendant's acts and/or omissions are unfair in that they (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers. Defendant has, through knowing, intentional, material omissions, concealed the true inferior nature of the Class Vehicles, and compromised hybrid system.

374. Defendant's acts and/or omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that could not have been reasonably avoided by consumers.

375. As a direct and proximate result of these unfair acts or practices, Plaintiff Gittings and Montana Subclass members have been damaged because they purchased Class Vehicles they otherwise would not have, paid more for Class Vehicles than they otherwise would have, received a vehicle worth less than the one they bargained and paid for, paid for diagnoses, repairs, and replacements, paid for fuel they otherwise would not have, and are left with Class Vehicles of diminished value and utility. Meanwhile, FCA has sold more Class Vehicles than it otherwise could have, and FCA has charged inflated prices for Class Vehicles, thereby unjustly enriching itself.

376. Pursuant to Mont. Code § 30-14-133, Plaintiff Gittings seeks actual damages, equitable relief, treble damages, a permanent injunction, and attorneys fees.

**COUNT XIII**
**Violation of Georgia's Fair Business Practices Act**
**– Placeholder Claim Only –**
**GA. CODE ANN. §10-1-390, *et seq*.)**
**(On Behalf of The Georgia Subclasses)**

377. Plaintiff Thompson and the Georgia Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

378.  Plaintiff Thompson intends to bring this claim on behalf of himself and the Georgia Subclass.

379.  Plaintiff Thompson intends to assert a claim under the Georgia Fair Business Practices Act ("Georgia FBPA") which declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, GA. CODE. ANN. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade ... if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," GA. CODE. ANN. § 10-1-393(b). On March 6, 2023, Plaintiff Thompson made a demand in satisfaction of GA. CODE. ANN. § 10-1-399(b) upon Defendant FCA, and may amend this Complaint to assert claims under the Georgia FBPA once the required 30 days have elapsed.

380.  This Cause of Action is included for purposes of notice only and is not intended to actually assert a claim under the Georgia FBPA at this time.

**COUNT XIV**
**Violation of Georgia's Uniform Deceptive Trade Practices Act**
**GA. CODE ANN. § 10-1-370, *et seq*.**
**(On Behalf of the Georgia Subclasses)**

381.  Plaintiff Thompson and the Georgia Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

114

382. Plaintiff Thompson brings this claim on behalf of himself and the Georgia Subclass.

383. Defendant, Plaintiff Thompson, and the Georgia Subclass are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), GA. CODE. ANN. § 10-1-371(5).

384. The Georgia UDTPA prohibits "deceptive trade practices," which includes the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." GA. CODE. ANN. § 10-1-372(a).

385. In the course of doing business, Defendant misrepresented, suppressed or omitted material facts concerning the Class Vehicles, including, but not limited to, the fact that the hybrid system does not perform as advertised, rendering the Class Vehicles unsuitable for electric-only or electric-assisted driving.  Defendant also knowingly failed to disclose, suppressed, concealed, and/or omitted material facts regarding the accurate MPG figures of the Class Vehicles and accurate horsepower and torque figures as advertised, which directly caused harm to Plaintiff Thompson and the members of the Georgia Subclass.  This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase or how much to pay for, for the compromised hybrid system and the Class Vehicles.

386.   Therefore, Defendant concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff Thompson and the Georgia Subclass would rely on the omissions in the purchase of their Class Vehicles.

387.   Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

388.   To this day, Defendant continues to violate the Georgia UDPTA by actively concealing the material information about the Class Vehicles and the Defect and by representing to Plaintiff Thompson and members of the Georgia Subclass that the Class Vehicles and the compromised hybrid system performs better than it in fact does and is suitable for certain uses for which it is not suited. Upon information and belief, Defendant has utilized the same fraudulent marketing strategy with regard to the 2022 and 2023 model years.

389.   Defendant thus violated the Georgia UDTPA by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, exaggeration, falsehood, innuendo or ambiguity as to a material fact;

116

(5) willfully failing to state a material fact, or willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

390.   Defendant had the duty to Plaintiff Thompson and the members of the Georgia Subclass to disclose the defective nature of the Class Vehicles because:

    a.   Defendant possessed exclusive knowledge that they were manufacturing, selling, and distributing hybrid SUVs throughout the United States that contained the defective hybrid systems;

    b.   Plaintiff Thompson and the members of the Georgia Subclass could not reasonably have been expected to learn or discover that the Class Vehicles had defects until those defects became manifest;

    c.   Defendant knew that Plaintiff Thompson and the members of the Georgia Subclass could not reasonably have been expected to learn about or discover the defective hybrid systems and the effect they would have on the Class Vehicles' reliability and performance.

391. In failing to disclose the defective hybrid system and its resulting reliability and performance concerns, Defendant knowingly and intentionally concealed and omitted material facts and breached its duty to disclose.

392. The facts Defendant concealed, misrepresented, or did not disclose to Plaintiff Thompson and the members of the Georgia Subclass are material in that a

reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a lesser price. Had Plaintiff Thompson and the members of the Georgia Subclass known the Class Vehicles were defective, they would not have purchased the Class Vehicles or would have paid less for them.

393. Defendant knowingly and intentionally misrepresented material facts regarding the Class Vehicles, intending for Plaintiff Thompson and the members of the Georgia Subclass to rely on those material misrepresentations when choosing to purchase a Class Vehicle instead of hybrid SUVs marketed and sold by Defendant's competitors.

394. Plaintiff Thompson and members of the Georgia Subclass justifiably relied on Defendant's material misrepresentations.

395. Defendant's violations present a continuing risk to Plaintiff Thompson as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

396. Plaintiff Thompson and the members of the Georgia Subclass suffered ascertainable loss directly and proximately resulting from Defendant's Georgia UDTPA violations. Plaintiff Thompson and the members of the Georgia Subclass have suffered actual damages and/or injury in fact, including, inter alia, having paid more for Class Vehicles than they otherwise would have, received a hybrid SUV worth less than the one they bargained and paid for, paid for diagnoses, repairs, and

118

replacements, paid for fuel they otherwise would not have, and are left with Class Vehicles of diminished value and utility.

397. Plaintiff Thompson and the members of the Georgia Subclass seek actual damages against Defendant in an amount to be determined at trial and statutory, treble, and/or punitive damages under the Georgia UDTPA. Plaintiff Thompson and the members of the Georgia Subclass also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices and awarding costs, attorneys' fees and restitution, disgorgement of funds, and any other just and proper relief available under the Georgia UDTPA.

**COUNT XV**
**Breach of the Implied Warranty**
**O.C.G.A. § 11-2-314 *et seq*.**
**(On Behalf of the Georgia Subclass)**

398. Plaintiff Thompson and the Georgia Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

399. Plaintiff Thompson (for purposes of this section, the "Georgia Plaintiff") brings this claim on behalf of himself and on behalf of the Georgia Subclass members against Defendant.

400. FCA is and was at all relevant times a merchant with respect to Class Vehicles within the meaning of O.C.G.A. § 11-2-104.

401. The Class Vehicles are and were at all relevant times goods within the meaning of O.C.G.A. § 11-2-105(1).

119

402.  Pursuant to O.C.G.A. § 11-2-314, a warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

403.  The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which hybrid SUVs are used. Specifically, the Class Vehicles are inherently defective in that the Class Vehicles cannot provide reasonably reliable transportation by the user's choice of electric-powered or gasoline powered movement. In fact, the electric-only or electric-assisted driving capacity is frequently unavailable. Therefore, the Class Vehicles are not fit for their particular purpose as a hybrid SUV.

404.  As a result of the Class Vehicles not being merchantable or fit for their ordinary purpose, the Georgia Plaintiff and the Georgia Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Class Vehicles, and increased time and expense in dealing with mitigation and repair.

405.  Privity is not required in this case because the Georgia Plaintiff and the Georgia Subclass were the intended beneficiaries of Defendant's warranties and its sale through authorizes retailers. Defendant's retailers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the

consumer only and the Georgia Plaintiff and the Georgia Subclass were the intended beneficiaries.

406.  Defendant was put on constructive notice about its breach through its review of consumer complaints and upon information and belief, through product testing and communications from dealerships. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

407.  Prior to the filing of this Complaint, the Georgia Plaintiff sent Defendant a pre-suit notice letter concerning the Defect setting forth Plaintiff's experiences with the Defect and his intentions to file the instant Complaint alleging a breach of the implied warranty on behalf of the Class or Subclass.

408.  As a direct and proximate result of FCA's breach of the implied warranties, the Georgia Plaintiff and the Georgia Subclass members have been damaged in an amount to be proven at trial.

## COUNT XVI
### Violation of Ohio's Consumer Sales Practices Act
### OHIO REV. CODE ANN. § 1345.01, *et seq*. (the "CSPA")
### (On Behalf of the Ohio Subclass)

409.  Plaintiff Kwiatkowski and the Ohio Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

410.  Plaintiff Kwiatkowski brings this claim individually and on behalf of the Ohio Subclass.

411.  FCA is a "person" within the meaning of CSPA § 1345.01(B) and is a "[s]upplier... engaged in the business of effecting or soliciting consumer transactions..." within the meaning of CSPA § 1345.01(C).

412.  FCA's acts and practices, as alleged in this Complaint, violate CSPA § 1345.02(A), (B)(1) and (B)(2) because they include unfair and deceptive acts and practices in connection with consumer transactions – the sale of defective hybrid SUVs. Specifically, in violation of the CSPA, FCA:

    a.  Knowingly designed, developed, manufactured, advertised, and sold the Class Vehicles with the Defect, resulting in defective hybrid systems that compromise reliability, performance and usability so that consumers did not receive the benefit of their bargain;

    b.  At the time of sale, Defendant knowingly and intentionally omitted and concealed material information regarding the Class Vehicles by failing to disclose to Plaintiff and Subclass members material information, namely the Defect and its impact on the performance of the Class Vehicles;

c.  Thereafter, Defendant failed to disclose these facts to Plaintiff and the Subclass members, through warnings or other notices, and/or actively concealed the Defect from them, even though Defendant knew of the issue at the time of manufacture because FCA designed and/or programmed the hybrid system to deactivate when FORM activated;

d.  Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

e.  Based on these and, upon information and belief, other internal studies and investigations, Defendant knew with certainty that the Class Vehicles would include the Defect and that the Class Vehicles would perform substantially worse than advertised and be unsuitable for some uses;

f.  Furthermore, Defendant engaged in materially misleading and deceptive acts by continuing to sell the Class Vehicles and compromised hybrid system to the consuming public and to represent that they were in good working order, merchantable, and performed as advertised, despite Defendant's knowledge that they would not perform as intended, represented, and warranted.

Specifically, beginning in September 2020, FCA made the above-discussed misleading representations to consumers on press releases regarding the attributes of the hybrid system, while omitting the Defect. In advertising and selling the Class Vehicles, which began in April 2020, FCA failed to disclose the reduced performance of the compromised hybrid system as well as FCA's inclusion of the compromised hybrid system in the Class Vehicles. FCA further exacerbated its misinformation by means of the above-discussed misleading Class Vehicle performance claims on FCA's website.

413.    FCA also committed unconscionable acts and practices in violation of CSPA § 1345.03(B)(3) because it knew, at the time the consumer transactions were entered into, that the consumers were unable to receive a substantial benefit of the subject of the consumer transactions.

414.    Through its design, development, and pre-release testing of the hybrid system, as well as through other consumer complaints, FCA knew that the Class Vehicles' hybrid system was defective and prone to the failure described throughout this Complaint.

415.    FCA was under a duty to disclose that the Class Vehicles were defective because it had superior knowledge of the defect – stemming from its own production

thereof, repair requests, complaints made directly to FCA and its dealer network, online complaints, quality control and pre-release testing, and online reputation management.

416. FCA had ample means and opportunities to disclose to Plaintiff Kwiatkowski and Ohio Subclass members that the Class Vehicles were defective, including through advertisements, and direct communications. Despite its exclusive knowledge and these opportunities to disclose the defect, FCA failed to disclose to Plaintiff Kwiatkowski and Ohio Subclass members the defective nature of the Class Vehicles either prior to purchase or before Plaintiff Kwiatkowski's and Ohio Subclass members' respective buyer's remorse periods expired.

417. FCA's misrepresentations and/or omissions were material. Had Plaintiff Kwiatkowski and members of the Ohio Subclass known that the Class Vehicles were defective, they either (a) would not have purchased them, (b) would not have purchased them at the prices they did, or (c) would have returned them during their respective buyer's remorse periods.

418. Requisite notice to FCA of its violations required under CSPA § 1345.09(B) has been satisfied here as FCA's violations constitute acts and practices that have been declared to be deceptive or unconscionable by rules adopted under CSPA § 1345.05(b)(2). Additionally, notice to FCA has likewise been satisfied under CSPA § 1345.09(B) due to deceptive and unconscionable acts and practices

similar to those alleged herein having already been determined by courts of the State of Ohio to be in violation of both CSPA §§ 1345.02 and 1345.03.

419.  Plaintiff Plaintiff Kwiatkowski and the Ohio Subclass were injured by FCA's CSPA violations. As a result, Plaintiff Kwiatkowski seek and are entitled to economic damages resulting from Defendant's violation of the CSPA, as well as to declaratory and injunctive relief under CSPA § 1345.09, such damages and relief to be further determined at trial.

420. Because FCA knowingly committed the violations alleged herein, Plaintiff Kwiatkowski also seeks attorneys' fees under CSPA § 1345.09(F)(2).

**COUNT XVII**
**Implied Warranty in Tort**
**(On Behalf of the Ohio Subclass)**

421.  Plaintiff Kwiatkowski and the Ohio Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

422.  Plaintiff Kwiatkowski (for purposes of this section, the "Ohio Plaintiff") bring this claim individually and on behalf of the Ohio Subclass members against Defendant.

423.  The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which hybrid SUVs are used. Specifically, the Class Vehicles are inherently defective in that the Class Vehicles cannot provide reasonably reliable transportation by the user's choice

of electric-powered or gasoline powered movement. In fact, the electric-only or electric-assisted driving capacity is frequently unavailable. Therefore, the Class Vehicles are not fit for their particular purpose as a hybrid SUV.

424.  As a result of the Class Vehicles not being merchantable or fit for their ordinary purpose, the Ohio Plaintiff and the Ohio Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Class Vehicles, and increased time and expense in dealing with mitigation and repair.

425.  Privity is not required in this case because the Ohio Plaintiff and the Ohio Subclass were the intended beneficiaries of Defendant's warranties and its sale through authorizes retailers. Defendant's retailers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer only and the Ohio Plaintiff and the Ohio Subclass were the intended beneficiaries.

426.  Defendant was put on constructive notice about its breach through its review of consumer complaints and upon information and belief, through product testing and communications from dealerships. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is

127

unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

427.  Prior to the filing of this Complaint, the Ohio Plaintiff sent Defendant a pre-suit notice letter concerning the Defect setting forth Plaintiff's experiences with the Defect and his intentions to file the instant Complaint alleging a breach of the implied warranty on behalf of the Class or Subclass.

428. As a direct and proximate result of FCA's breach of the implied warranties, the Ohio Plaintiff and the Ohio Subclass members have been damaged in an amount to be proven at trial.

**COUNT XVIII**
**Breach of the Implied Warranty**
**13 PA. STAT. AND CONS. STAT. ANN. § 2314 *et seq.***
**(On Behalf of the Pennsylvania Subclass)**

429.  Plaintiff Figley and the Pennsylvania Subclass incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

430. Plaintiff Figley (for purposes of this section, the "Pennsylvania Plaintiff") brings this claim on behalf of himself and on behalf of the Pennsylvania Subclass members against Defendant.

431.  FCA is and was at all relevant times a merchant with respect to Class Vehicles within the meaning 13 PA. STAT. AND CONS. STAT. ANN. § 2104(1).

432.  The Class Vehicles are and were at all relevant times goods within the meaning of 13 PA. STAT. AND CONS. STAT. ANN. § 2105(1).

433.  Pursuant to 13 PA. STAT. AND CONS. STAT. ANN. § 2314(1), a warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

434.  The Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which hybrid SUVs are used. Specifically, the Class Vehicles are inherently defective in that the Class Vehicles cannot provide reasonably reliable transportation by the user's choice of electric-powered or gasoline powered movement. In fact, the electric-only or electric-assisted driving capacity is frequently unavailable. Therefore, the Class Vehicles are not fit for their particular purpose as a hybrid SUV.

435.  As a result of the Class Vehicles not being merchantable or fit for their ordinary purpose, the Pennsylvania Plaintiff and the Pennsylvania Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Class Vehicles, and increased time and expense in dealing with mitigation and repair.

436.  Privity is not required in this case because the Pennsylvania Plaintiff and the Pennsylvania Subclass were the intended beneficiaries of Defendant's warranties and its sale through authorizes retailers. Defendant's retailers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the

warranty agreements. Defendant's warranties were designed for and intended to benefit the consumer only and the Pennsylvania Plaintiff and the Pennsylvania Subclass were the intended beneficiaries.

437. Defendant was put on constructive notice about its breach through its review of consumer complaints and upon information and belief, through product testing and communications from dealerships. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

438. Prior to the filing of this Complaint, the Pennsylvania Plaintiff sent Defendant a pre-suit notice letter concerning the Defect setting forth Plaintiff's experiences with the Defect and his intentions to file the instant Complaint alleging a breach of the implied warranty on behalf of the Class or Subclass.

439. As a direct and proximate result of FCA's breach of the implied warranties, the Pennsylvania Plaintiff and the Pennsylvania Subclass members have been damaged in an amount to be proven at trial.

### COUNT XIX
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. §§ 201-1, *et seq*.)
### (On Behalf of the Pennsylvania Subclass)

440. Plaintiff Figley repeats and realleges, as if fully stated herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

130

441.   Plaintiff Figley brings this cause of action individually and on behalf of the members of the Pennsylvania Subclass.

442.   Plaintiff Figley and the Pennsylvania Subclass purchased the Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S.§ 201-9.2.

443.   All of the acts complained of herein were perpetrated by Defendant in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

444.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including:

(d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4)

445.   Defendant engaged in unlawful trade practices including selling hybrid SUVs with defective hybrid systems as described in this Complaint herein, and by engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

446.   In the course of its business, Defendant willfully failed to disclose and actively concealed the defective hybrid system discussed herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or

practices, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

447.   Defendant knew it had installed defective hybrid systems in the Class Vehicles and knew that the defective hybrid systems would not perform as advertised, including not being able to operate on battery power alone and/or use the hybrid battery as a hybrid system. Despite this knowledge, Defendant concealed all of that information.

448.   In the course of Defendant's business, it willfully failed to disclose and actively concealed the Defect.

449.   Defendant's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Figley and the Pennsylvania Subclass, about the true functionality of the Class Vehicles, the quality of the Jeep brand, and the true value of the Class Vehicles. FCA knew or should have known that its conduct violated the Pennsylvania CPL.

450.   Defendant owed a duty to disclose the Defect to Plaintiff Figley and the Pennsylvania Subclass because Defendant possessed superior and exclusive knowledge regarding the Defect. Rather than disclose the defect, Defendant engaged in unfair and deceptive trade practices in order to sell additional hybrid

132

SUVs and avoid the cost of recalling the Class Vehicles and refunding the purchase price.

451.   Defendant also made partial misleading representations in the Class Vehicle warranty books as to the duration of FORM and ability of the Class Vehicles to exit FORM.

452.   Defendant's unfair and deceptive practices and/or material omissions regarding the Defect were intended to mislead consumers and misled Plaintiff Figley and the Pennsylvania Subclass.

453.   At all relevant times, Defendant's unfair and deceptive acts or practices and/or omissions regarding the defective hybrid system were material to Plaintiff Figley and the Pennsylvania Subclass.  When Plaintiff Figley and the Pennsylvania Subclass purchased their Class Vehicles, they had the reasonable expectation that the Class Vehicle would be free from defects and would have a safe, non-defective hybrid system.  Had Defendant disclosed that the Class Vehicles' hybrid systems were defective, and would cause significant monetary losses, Plaintiff Figley and the Pennsylvania Subclass would not have purchased the Class Vehicles or would have paid less for them.

454.   Defendant's unlawful acts and practices affect the public interest and trade and commerce in the State of Pennsylvania, were in bad faith, and present a continuing hazard to Plaintiff Figley, the Pennsylvania Subclass and the public.

133

455.   As a direct and proximate result of Defendant's violations of the Pennsylvania CPL, Plaintiff Figley and the Pennsylvania Subclass have suffered actual damages and/or injury in fact, including, having paid more for Class Vehicles than they otherwise would have, received a hybrid SUV worth less than the one they bargained and paid for, paid for diagnoses, repairs, and replacements, paid for fuel they otherwise would not have, and are left with Class Vehicles of diminished value and utility.

456.   Defendant is liable to Plaintiff Figley and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a).  Plaintiff Figley and the Pennsylvania Subclass are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, prays that this Court:

A.   Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Nationwide Class and State Subclasses as defined above;

134

B.      Appoint Plaintiffs as representatives of the Nationwide Class and the State Subclasses and their counsel as Class Counsel;

C.      Award all actual, general, special, incidental, consequential, punitive, and exemplary damages and restitution to which Plaintiffs and Class Members are entitled;

D.      Award pre- and post-judgment interest on any monetary relief;

E.      Grant appropriate injunctive relief against Defendant, including an order requiring FCA to buy back or permanently and completely repair the Class Vehicles pursuant to its obligations under the terms of the Warranty;

F.      Determine that Defendant is financially responsible for all Class notice and administration of Class Relief;

G.      Award reasonable attorney fees and costs; and

H.      Grant such further relief that this Court deems appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: April 4, 2023    */s/ P. Bradford deLeeuw*

        P. Bradford deLeeuw (DE Bar # 3569)
        DELEEUW LAW LLC
        1301 Walnut Green Road
        Wilmington DE 19807
        (302) 274-2180
        brad@deleeuwlaw.com

OF COUNSEL:

Nicholas A. Migliaccio (P29077)
Jason S. Rathod (P18424)
MIGLIACCIO & RATHOD LLP
412 H St. NE, Suite 302
Washington D.C. 20002
(202) 470-3520
nmigliaccio@classlawdc.com
jrathod@classlawdc.com

Daniel E. Gustafson (MN #202241)
David A. Goodwin (MN # 0386715)
Noah L. Cozad (MN#0402643)
GUSTAFSON GLUEK PLLC
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622
*dgustafson@gustafsongluek.com*
*dgoodwin@gustafsongluek.com*
*ncozad@gustafsongluek.com*

Scott D. Hirsch (FL Bar No. 50833)
SCOTT HIRSCH LAW GROUP, PLLC
6810 N. St. Road 7
Coconut Creek, FL 33073
Telephone: (561) 569-7062
scott@scotthirschlawgroup.com